In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 21-1042

JOSEPH BROWN, et al.,

*Plaintiffs-Appellants*,

*v.*

JEFFREY L. KEMP, et al.,

*Defendants-Appellees*.

---

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:17-cv-00549-wmc — **William M. Conley**, *Judge*.

---

ARGUED SEPTEMBER 27, 2021 — DECIDED NOVEMBER 13, 2023

---

Before ROVNER, HAMILTON, and KIRSCH, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Different constitutional rights collide in this case. Article I, section 26 of the Wisconsin Constitution protects the right to hunt. The First Amendment to the United States Constitution protects freedom of speech. Since 1990, Wisconsin has had a special statute making it a crime to harass hunters in various ways. The Wisconsin legislature amended the so-called "hunter harassment law" effective in 2016 in a way that raises First Amendment issues. The

amended law makes it a crime to interfere intentionally with a hunter by "maintaining a visual or physical proximity" to the hunter, by "approaching or confronting" the hunter, or by photographing, videotaping, audiotaping, or otherwise recording the activity of the hunter. Wis. Stat. § 29.083(2)(a)(7) (2016). The three plaintiffs here oppose hunting. Plaintiffs have observed hunters on public land and have sometimes approached and confronted them. Plaintiffs have also photographed and filmed hunters' activities, and plaintiffs intend to continue all these activities. Plaintiffs assert that the prohibitions of subsection (2)(a)(7) violate the First and Fourteenth Amendments to the United States Constitution.

In this pre-enforcement challenge, the district court granted defendants' motion for summary judgment. The district court found that plaintiffs lack standing to bring an as-applied challenge to subsection (2)(a)(7) and that their facial constitutional challenges fail on the merits. *Brown v. Kemp*, 506 F. Supp. 3d 649, 651 (W.D. Wis. 2020). We reverse and remand.

Part I lays out relevant facts and procedural history. Part II begins our analysis by parsing the statutory text to focus the constitutional issues. Part III explains that plaintiffs have standing to bring both their as-applied and facial challenges prior to formal enforcement efforts because subsection (2)(a)(7) has been used to harass and intimidate them and has caused them to refrain from engaging in activity protected by the First Amendment. On the merits, Part IV explains that the clauses of subsection (2)(a)(7) are unconstitutionally vague and/or overbroad. Finally, Part V explains that subsection (2)(a)(7) discriminates against speech and expressive activity based on viewpoint and that defendants have not offered justifications for the provision that satisfy strict scrutiny.

I.   *Factual & Procedural Background*

    A.  *Facts*

Plaintiffs are members of or associated with Wolf Patrol, an organization that opposes hunting and monitors and documents hunting activities on public lands throughout Wisconsin to ensure that hunters comply with state regulations. Plaintiffs also seek to educate the public about hunting in Wisconsin. Plaintiff Joseph Brown, a professor at Marquette University, opposes wolf hunting. He makes documentary films to further debate. He has been filming wolf hunters and Wolf Patrol's monitoring activities for several years as part of a documentary film about the pros and cons of wolf hunting in Wisconsin. Working with volunteers with Wolf Patrol, he has amassed over 300 hours of documentary video of hunting in Wisconsin.

Plaintiff Stephanie Losse is an environmental and animal-rights advocate and Wolf Patrol volunteer. She monitors hunting activities for illegal and inhumane conduct and takes photographs and videos of hunting activities to use in educational materials for the public. Plaintiff Louis Weisberg is a journalist who has a professional interest in documenting and reporting on hunting in Wisconsin. Weisberg advocates on behalf of Wisconsin wolves and bears and, through his work, provides an outlet for organizations like Wolf Patrol to share with the public their perspective on issues related to hunting.

After subsection (2)(a)(7) of the amended hunter harassment law took effect in 2016, plaintiffs Brown and Losse had a number of encounters with hunters and law enforcement officers, including repeated stops for questioning by law enforcement and harassment by hunters, in the course of

plaintiffs' monitoring and documenting activities, including photographing and filming of hunting. All activities relevant to this case have occurred on public lands where both hunters and plaintiffs were legally entitled to be present.

While monitoring hunters on Wisconsin public lands, plaintiff Losse has been stopped by hunters who have accused her of harassment and called law enforcement to the scene. Losse testified that despite her best efforts to comply with the hunter harassment law, she and her colleagues are "regularly stopped and questioned by sheriff's deputies, state police, and DNR officers." On one occasion, a hunter stepped out into the road to stop a Wolf Patrol vehicle that Losse was riding in and told her that "there's a law in the state now that [you] can't be in the area." On another occasion, in 2015, a Polk County sheriff's deputy told Losse that she would be cited for violating the hunter harassment law even before the amendments on photography and video recordings took effect. The deputy did not issue the citation because he experienced technical difficulties when trying to prepare one. In other words, Losse was taken right to the brink of an enforcement action against her for protected activity.

Plaintiff Brown too has had encounters with both hunters and law enforcement that have also gone to the brink of an enforcement action against him. Hunters, seeing Professor Brown and Wolf Patrol filming, have "become irate," approached Brown, and demanded that he and the film crew hand over their footage. Hunters have confronted Brown and Wolf Patrol monitors, surrounding them, using their vehicles to prevent Brown and the others from passing through public roads, and detained them "for hours at a time" while waiting for law enforcement to arrive. During these confrontations, in

addition to "yelling" and "name-calling," hunters have threatened Brown and the Wolf Patrol monitors. One hunter told Brown (incorrectly) that he "cannot legally videotape a hunt in Wisconsin." Brown believes, quite reasonably, that this was a reference to the new subsection (2)(a)(7) in the law. He also claims that hunters have, during these encounters, asserted to him and to the Wolf Patrol that they, the hunters, were themselves "officer[s] of the law." Regardless of Brown's account of the statements directed to him, it is undisputed that hunters have repeatedly told Brown that they cannot be photographed and that hunters have repeatedly referred to the hunter harassment law when speaking to law enforcement officers responding to their calls for help in stopping Brown from continuing to film and observe them.

Plaintiffs' standing and claims in this case are not based, however, on hunters' misstatements or exaggerations of the law. Law enforcement officers have also "many times" stopped Brown and Wolf Patrol members he has been working with to ask them why they were "making multiple passes through an area." On one occasion, "the responding officer questioned [Brown] and the Wolf Patrol members for over an hour," taking that time to "explain[ ]" the hunters' concerns and to obtain information about Brown and the Wolf Patrol members' activities.

The most significant such incident took place in January 2018, shortly after this case was filed. Brown and Wolf Patrol members were doing documentary work in Forest County. A large group of hunters surrounded Brown and the Wolf Patrol members with their trucks, barricading them in while law enforcement was called. One hunter said, "Block 'em in so we can wait for the game warden to get here. We've got 'em

f***ed." The hunters proceeded to berate Brown and the Wolf Patrol members, "using foul language and threatening to beat them up and run them over." At one point in the angry confrontation, a hunter drove his pickup truck to bump a member of the Wolf Patrol multiple times. The hunters called law enforcement.

Forest County sheriff's deputies responded, and Brown was questioned about his filming activities. Thinking that Brown may have recorded disputed events in this angry confrontation, deputies seized all of Brown's filming equipment and footage, including four cameras, two memory cards, a microphone, batteries, all videography accessories, and a cellphone. Law enforcement told Brown that they would be seeking a warrant to search his footage.

Twelve days later, deputies applied for and obtained a warrant to search Brown's devices and to view his film footage. The warrant application said that Brown's devices and footage could constitute evidence of violations of Wisconsin's hunter harassment law, as well as four other Wisconsin statutes.[1] After searching and viewing all videos and footage seized from Brown, the Sheriff's Department sent the recordings to the District Attorney, defendant Charles Simono, for review. In August 2018, a little more than a year after this lawsuit was filed, District Attorney Simono stated by sworn declaration that no charges would be brought against Professor Brown based on the January 2018 incident. Around that same time, Professor Brown's equipment and recordings were returned to him, roughly seven months after they were seized.

---

[1] The other statutes listed in the warrant were for disorderly conduct, harassment, obstructing law enforcement, and battery.

In response to these encounters with hunters and law enforcement, plaintiffs Losse and Brown have adjusted their monitoring, filming, and documenting activities. Losse does not go on as many monitoring trips and takes fewer pictures when she does. Both she and Brown now stick to federally owned land and avoid visiting state-owned land. Even on federal lands, plaintiffs stay on the public roads, largely keeping to their vehicles, and they do not "venture into the forest to get better footage, as they otherwise would but for the Statute." Brown no longer films in Polk or Forest Counties. For his part, plaintiff Weisberg testified to feeling chilled in his ability to report on hunting in Wisconsin because, under the amended hunter harassment law, he now "fears sending journalists into the field to document" and report on "hunter activity in Wisconsin."

B. *Procedural History*

In July 2017, plaintiffs filed this suit seeking a declaration that subsection (2)(a)(7) of the Wisconsin hunter harassment law is unconstitutional both on its face and as applied to them, as well as an injunction against enforcement of the challenged provision. They argued that subsection (2)(a)(7) is unconstitutionally vague and overbroad, chills the exercise of their First Amendment rights, is viewpoint-based, and fails to survive strict scrutiny.

After discovery and on cross-motions for summary judgment, the district court granted summary judgment to the defendants. *Brown*, 506 F. Supp. 3d at 651. In the district court's view, plaintiffs lack standing to bring their as-applied challenges, "effectively clos[ing] the door to any content or viewpoint-based challenges." *Id.* at 659. The district court rejected

the overbreadth and vagueness challenges on the merits. *Id.* at 660–63. Plaintiffs have appealed.

II. *Wisconsin's Hunter Harassment Law*

Wisconsin enacted its first hunter harassment law in 1990. See Wis. Stat. § 29.223 (1990), later recodified as § 29.083. Plaintiffs do not challenge here any provisions of the original law, which was construed to apply only to physical interference with hunting and fishing. *State v. Bagley*, 164 Wis. 2d 255, 474 N.W.2d 761 (Wis. App. 1991). Effective in 2016, the Wisconsin legislature amended the statute to add prohibitions on "maintaining a visual or physical proximity" to a hunter, "approaching or confronting" a hunter, and "photographing, videotaping, audiotaping," or otherwise monitoring or recording a hunter's activities. See Wis. Stat. § 29.083(2)(a)(7).

On appeal, defendants have taken the position that the 2016 amendments did not effectively add any new prohibitions to the hunter harassment law. *Recording of Oral Argument* at 20:45–20:55, 28:30–30:00. We thus begin our legal analysis by parsing relevant aspects of the original hunter harassment law and the 2016 amendments.

A. *The Original Version from 1990*

As enacted in 1990, Wisconsin's hunter harassment law established two broad prohibitions in subsections (a) and (b):

> (a) No person may interfere or attempt to interfere with lawful hunting, fishing or trapping with the intent to prevent the taking of a wild animal by doing any of the following:

1.  Harassing a wild animal or by engaging in an activity that tends to harass wild animals.

2.  Impeding or obstructing a person who is engaged in lawful hunting, fishing or trapping.

3.  Impeding or obstructing a person who is engaged in an activity associated with lawful hunting, fishing or trapping.

4.  Disturbing the personal property of a person engaged in lawful hunting, fishing or trapping.

5.  Disturbing a lawfully placed hunting blind.

(b) No person may knowingly fail to obey the order of a warden or other law enforcement officer to desist from conduct in violation of par. (a) ….

§ 29.223(2)(a)–(b) (1990). The statute recognized an affirmative defense based on federal and state constitutional rights of freedom of speech. § 29.223(3m) (1990).

The statute did not limit enforcement to public prosecutors and law-enforcement officials. It also created a private right of action. A person "who is adversely affected by, or who reasonably may be expected to be adversely affected by, conduct that is in violation" of the statute may "bring an action in circuit court for an injunction or damages or both." § 29.223(4)(a) (1990).

Soon after the law took effect, several defendants were cited for violating the law by using their boat to block Native American spear-fishermen from launching their own boat. A trial court dismissed the citations on constitutional grounds, but the Wisconsin Court of Appeals rejected those constitutional challenges and reversed. *Bagley*, 474 N.W.2d at 766. The court held that "the statute limits its application to physical interference…." *Id.* at 764. The statute's use of "impeding" and "obstructing," the court determined, applied only to "physical interference or obstruction, not verbal." *Id*.

B.  *The 2016 Amendments*

Effective in 2016, the Wisconsin legislature amended the statute. Wis. Stat. § 29.083. We reproduce the relevant subsections here, with 2016 additions shown in bold.

> (2) Prohibitions. (a) No person may interfere or attempt to interfere with lawful hunting, fishing, or trapping with the intent to prevent the taking of a wild animal, **or intentionally interfere with or intentionally attempt to interfere with an activity associated with lawful hunting, fishing, or trapping,** by doing any of the following:
>
>   1.  Harassing a wild animal or by engaging in an activity that tends to harass wild animals.
>
>   2.  Impeding or obstructing a person who is engaged in lawful hunting, fishing or trapping.

3. Impeding or obstructing a person who is engaged in an activity associated with lawful hunting, fishing or trapping.

4. Disturbing the personal property of a person engaged in lawful hunting, fishing or trapping.

5. Disturbing a lawfully placed hunting blind or stand.

6. **Disturbing lawfully placed bait or other material used to feed or attract a wild animal.**

7. **Engaging in a series of 2 or more acts carried out over time, however short or long, that show a continuity of purpose and that are intended to impede or obstruct a person who is engaged in lawful hunting, fishing, or trapping, or an activity associated with lawful hunting, fishing, or trapping, including any of the following:**

   a. **Maintaining a visual or physical proximity to the person.**

   b. **Approaching or confronting the person.**

   c. **Photographing, videotaping, audiotaping, or through other electronic means, monitoring or recording the activities of the person. This subd. 7.**

> **c. applies regardless of where the act occurs.**
>
> d.  **Causing a person to engage in any of the acts described in subd. 7.a. to c.**
>
> 8.  **Using a drone, as defined in s. 941.292(1), to conduct any activity prohibited under subds. 1. to 7.**

§ 29.083(2)(a) (2016). The amendment also increased fines and authorized much heavier fines and imprisonment for repeat offenses. § 29.971(11r). The private right of action and the affirmative defense under the First Amendment were not changed.

We focus here on the new subsection (2)(a)(7), which expands the list of acts that can constitute interference so long as "a series of 2 or more" of those acts is "carried out over time, however short or long," and the acts "show a continuity of purpose and … are intended to impede or obstruct a person who is engaged in lawful hunting, fishing, or trapping, or an activity associated with lawful hunting, fishing, or trapping." § 29.083(2)(a)(7).[2] Qualifying acts include but are not limited to: (a) "Maintaining a visual or physical proximity to the person"; (b) "Approaching or confronting the person"; (c) "Photographing, videotaping, audiotaping, or through other electronic means, monitoring or recording the activities of the

---

[2] The Wisconsin Court of Appeals has found that a series of acts carried out in "about three minutes" satisfied the "carried out over time, however short or long" component of the statute. *State v. Froebel*, 387 Wis. 2d 686, 928 N.W.2d 810, 812 (Wis. App. 2019).

person … regardless of where the act occurs"; and (d) "Causing a person to engage in any" of these acts. § 29.083(2)(a)(7).

Defendants argue that subsection (2)(a)(7) does not expand the reach of the statute. The theory seems to be that any conduct prohibited by (2)(a)(7) was already prohibited by the original statute, and that the new (2)(a)(7) only added the extra requirement for two or more related acts carried out over time and showing a continuity of purpose. If that were correct, the *Bagley* restriction of the statute to "physical interference" would remain intact and plaintiffs should, in theory, have nothing to worry about from the amendment. On that rosy hypothesis, any angry confrontation should be resolved with a calm, lawyerly explanation to angry hunters that the 2016 addition of subsection (2)(a)(7) was an empty political gesture.

This contention cannot be squared with the language of the amendment. Subsection (2)(a)(7) added three prohibitions that do not entail any sort of *physical* interference with or obstruction of hunting: maintaining a visual or physical proximity to a hunter, approaching or confronting a hunter, and photographing, videotaping, audiotaping or otherwise monitoring or recording the activity of the hunter. Each can occur without any physical interference. To the extent the defendants argue that this portion of the legislature's amendment was futile or symbolic, having no practical effect, we doubt that is a sound way of interpreting a statute, particularly one that uses language so clearly reaching beyond the prior version as limited by the state courts. See *State ex rel. Kalal v. Circuit Court for Dane County*, 271 Wis. 2d 633, 663, 681 N.W.2d 110, 124 (Wis. 2004) (Sykes, J.) (under Wisconsin law, statutory interpretation must focus on language of the statute,

which is read where possible "to give reasonable effect to every word, in order to avoid surplusage"); accord, *Wittman v. Koenig*, 831 F.3d 416, 422 (7th Cir. 2016) (applying Wisconsin rules of statutory interpretation); A. Scalia & B. Garner, Reading Law 174–79 (2012) (summarizing canon against surplusage).

The dissenting opinion disagrees with this reading of the statute, arguing that subsection (2)(a)(7) incorporates the *Bagley* requirement of physical interference or obstruction in the new provisions. The dissenting opinion relies on the general principle of statutory construction that when a legislature uses language that has a settled judicial interpretation, courts should ordinarily carry over the old interpretation to the new use of that language. Post at 72. That is generally true, at least absent clear indications of a different intent. *Id.* at 73, quoting *United States v. Johnman*, 948 F.3d 612, 619 (3d Cir. 2020). But here, we have such clear indications in the logical and linguistic gap between physical interference and the activities newly prohibited by subsection (2)(a)(7).

If the new subsection (2)(a)(7) incorporates *Bagley's* physical-interference limit, what does it prohibit that was not already prohibited? In oral argument, we asked counsel for defendants several times to identify conduct prohibited by the new subsection (2)(a)(7) that was not already prohibited by the earlier version of the statute. Defendants were unable to identify such an example. The dissenting opinion, which would also incorporate the physical obstruction requirement

into the new subsection (2)(a)(7), also has not identified such an example.[3]

The defendants and the dissenting opinion are unable to identify an example because the substantive content of subsection (2)(a)(7) precludes any reading of the statute that includes a physical-interference requirement. To the extent the defendants' or the dissenting opinion's view of new subsection (2)(a)(7) depends on that physical-interference requirement, the amended provisions seem to point to an empty set. That is not a sound reading of the statute.

Nevertheless, the dissenting opinion insists there is "nothing futile or symbolic about the legislature passing a new statute that prohibits a person from engaging in a series of acts akin to stalking with the intent to physically interfere with a person engaged in hunting activities." Post at 75. The dissenting opinion points out that the new subsection (2)(a)(7) was

---

[3] The dissenting opinion tries to offer examples at pages 76–77 with the hypothetical behavior of "Photographer B" who tries but fails to position herself between hunter and prey. The first problem is that the examples clearly describe unsuccessful *attempts* to interfere *physically* with hunting, foiled only by the movement of the prey. Such attempts were already criminal under the 1990 version of the hunter harassment law. See Wis. Stat. § 29.083(2)(a) ("No person may interfere or attempt to interfere…."). The dissenting opinion then tries to dig in more deeply, seeking a meaningful difference between interfering with a hunt and interfering with a hunter. Moreover, even if there were any substance to these trivial examples, note that nothing in the examples depends at all on "Photographer B" having or using a camera. Yet the text of subsection (2)(a)(7) makes photography and video recording of hunting its prime targets. The dissenting opinion's attempt to find an example has lost touch with the statutory language and scope, reducing the new law to something the legislature would not recognize.

framed in terms that echo the Wisconsin criminal statute on stalking, Wis. Stat. § 940.32. That statute includes prohibitions on "Maintaining a visual or physical proximity to the victim;" "Approaching or confronting the victim;" and "Photographing, videotaping, audiotaping, or, through any other electronic means, monitoring or recording the activities of the victim. This subdivision applies regardless of where the act occurs." § 940.32(1)(a). The dissenting opinion seems to imply that if we agree that if those provisions of the stalking statute do not point to an empty set, that is, criminalize behavior that would otherwise be legal, so too do the hunter-harassment amendments.

There are important differences, however, in the intent requirements for the two statutes that refute this argument.[4] Stalking activities are prohibited when they "would cause a reasonable person under the same circumstances to suffer serious emotional distress or to fear bodily injury to or the death of himself or herself or a member of his or her family or household." § 940.32(2)(a). By comparison, the new subsection (2)(a)(7) in the hunting harassment statute does not include such an element of emotional distress or fear, but it does tack on an additional requirement of intent to impede or obstruct hunting or fishing. The stalking statute has no such requirement for intent to impede or obstruct the victim. This difference makes clear that under the stalking statute, the prohibited activities do not require any physical interference with the victim, nor any intent to do so. As we explained above, it is the "intent to physically interfere with stalking"

---

[4] We discuss the significance of these differences in more detail in our discussion of the vagueness of subsection (2)(a)(7)(a)-(b), below at pages 49–50.

requirement advocated by the dissenting opinion that would leave the new subsection (2)(a)(7) pointing to an empty set. The parallels to the stalking statute, then, cannot solve the logical problems created by adding a "physical interference" requirement to subsection (2)(a)(7).

Even if the text itself did not provide sufficient certainty of the legislature's intent to expand the scope of prohibited activities to include non-physical interference, the legislative history of the hunter-harassment law removes any doubt. The Senate sponsor of the bill that added subsection (2)(a)(7) explained the bill to the Senate committee: "Currently, the law prohibits a person from intentionally interfering with hunting, trapping and fishing by harassing a wild animal or impeding a person engaged in lawful hunting. This bill would *expand prohibited behaviors* to include disturbing a lawfully placed stand or lawfully placed bait or other feed, *systematically photographing and videotaping hunters*, or using a drone for these purposes. The bill will also increase penalties to those engaging in this type of behavior." Dkt. 47-4 emphases added. The House sponsor made clear in his testimony that the new law was intended to "strengthen" the old law because it was not sufficient to prevent what he described as Wolf Patrol's harassment of and interference with hunters that was *not* physical in nature. Dkt. 36-3 at 3–4.

Accordingly, we reject the assertion that *Bagley*'s restriction to physical interference or obstruction carries over to the new prohibitions of subsection (2)(a)(7). As relevant here, a person violates this subsection if he or she (1) intends to impede or obstruct a hunter or hunting activity and (2) interferes or attempts to interfere by (3) engaging in at least two of the following acts: photographing, videotaping, audiotaping,

monitoring, recording, approaching, confronting, or main-
taining visual or physical proximity to a hunter or member of
a hunting party.[5]

III. *Standing*

The district court found that plaintiffs lack standing for
their facial challenges to subsection (2)(a)(7), while defend-
ants argue that plaintiffs lack standing for any of their

---

[5] The dissenting opinion suggests we use Circuit Rule 52 to certify to
the Wisconsin Supreme Court the question whether new subsection
(2)(a)(7) includes a requirement of physical obstruction or interference
with hunting. Cf. *Indiana Right to Life Victory Fund v. Morales*, 66 F.4th 625,
632–33 (7th Cir. 2023) (certifying statutory question to Indiana Supreme
Court); *Citizens for John W. Moore Party v. Board of Election Comm'rs*, 781
F.2d 581, 583–84 (7th Cir. 1986) (Easterbrook, J., dissenting) (noting that
this court is "bombarded" with requests to certify questions to state courts
but regularly declines unless question is "unusually close and difficult").
The parties have not suggested we take that step. The new statutory lan-
guage, the absence of an explanation for how audiovisual recording or
other electronic monitoring activity could physically interfere with hunt-
ing, and the corroborating evidence that the new subsection (2)(a)(7) was
in fact intended to expand the prohibitions all weigh heavily in favor of
our interpretation of the new language as expanding the law beyond the
already-illegal physical interference, and even as aimed at plaintiffs' ac-
tivities in particular. Waiting for state courts to interpret a challenged stat-
ute is appropriate where a state law is susceptible to a reasonable inter-
pretation that would remove or substantially alter the federal constitu-
tional issue. See *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289,
306, quoting *Harman v. Forssenius*, 380 U.S. 528, 534 (1965) (contemplating
abstention by federal courts only "where the issue of state law is uncer-
tain"). In this case, given these considerations and the defendants' and the
dissenting opinion's inability to identify under their interpretations an ap-
plication for the new subsection (2)(a)(7) that would not already have been
criminal before the amendment, we do not see a need to take the extra step
of certification to the state courts.

challenges. We find that plaintiffs have shown their standing to bring all their challenges.

A. *General Standards*

Article III of the United States Constitution limits the jurisdiction of federal courts "to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). To invoke "the federal judicial power," a plaintiff must have standing—a "'personal stake' in the case." *Id.*, quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997). Standing analysis centers on whether the plaintiff has suffered or is likely to suffer an "injury in fact." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing, the plaintiff's injury must satisfy three fundamental requirements: an injury that (1) is concrete and particularized, (2) was or will be caused by the defendant, and (3) likely will be remedied by a favorable judgment. E.g., *Lujan*, 504 U.S. at 560–61. Future injuries must be "imminent, not 'conjectural' or 'hypothetical.'" *Id.* at 560, quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990), quoting in turn *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).

B. *Pre-Enforcement Challenges*

Plaintiffs have not actually been cited for violating the hunter harassment law, so they rely on a long line of cases allowing pre-enforcement challenges to laws that deter the exercise of constitutional rights, especially First Amendment rights. A party who is the target of an unconstitutional law need not expose himself to liability before challenging its constitutionality if there are "circumstances that render the threatened enforcement sufficiently imminent." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–59 (2014); accord, e.g.,

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). In the language of *Lujan*, a plaintiff may establish a sufficient threat of an imminent future injury rather than a past injury.

To demonstrate such circumstances, the plaintiff must show "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the] statute." *Babbitt*, 442 U.S. at 298; *Sweeney v. Raoul*, 990 F.3d 555, 559 (7th Cir. 2021). Both *Babbitt* and later cases have also made clear that a plaintiff does not need to show or confess that her intended conduct will actually violate the statute in question if enforcement is likely against her. *Babbitt*, 442 U.S. at 301–02 (plaintiffs had standing to challenge prohibition on dishonest publicity, even though they did not "plan to propagate untruths," since "erroneous statement is inevitable in free debate"); accord, *Susan B. Anthony List*, 573 U.S. at 158–59 (reversing denial of standing on precisely this basis, making same point, and discussing *Babbitt* and other cases). Plaintiffs may also establish standing based on a *current* injury if they have resorted to self-censorship out of "an actual and well-founded fear" that the law will be enforced against them. *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 393 (1988). In other words, to ensure that the risk of prosecution is "credible," *Babbitt*, 442 U.S. at 298, plaintiffs must demonstrate that their fear is both actual and reasonable. A plaintiff whose fears of prosecution are merely "imaginary or speculative" will lack standing to challenge a law. *Babbitt*, 442 U.S. at 298, quoting *Younger v. Harris*, 401 U.S. 37, 42 (1971).

To show standing, plaintiffs are not required to show that they will win on the merits of their constitutional claims. See *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) (standing

sufficient for pre-enforcement review but plaintiffs lost on merits of constitutional claims). To suffice for standing, and to avoid confusing standing with the merits, plaintiffs' intended course of conduct need only be "arguably" affected by constitutional interests, and "arguably" proscribed by the challenged statute. *Babbitt*, 442 U.S. at 298.

### C. Plaintiffs' Showing of Standing

Plaintiffs Brown, Losse, and Weisberg have come forward with evidence sufficient to show standing to bring this pre-enforcement challenge to subsection (2)(a)(7). Plaintiffs' conduct includes expressive activity protected by the First Amendment, meaning that their conduct is "affected by a constitutional interest." *Babbitt*, 442 U.S. at 298. Plaintiffs have shown that their constitutionally protected conduct falls at least arguably within the statute's prohibitions. See *id*. Plaintiffs have also offered evidence that, in response to the new law and preliminary enforcement steps, they have resorted to self-censorship out of "an actual and well-founded fear" of enforcement proceedings against them.

### 1. Plaintiffs' Past and Intended Conduct

Plaintiffs Brown, Losse, and Weisberg each testified to distinct courses of conduct in relation to monitoring and documenting hunting and trapping activity in Wisconsin. Plaintiffs Brown and Losse are either affiliated with or have worked with Wolf Patrol, a group with the avowed purpose of "monitoring hunters and trappers in the woods and fields, photographing and taking videos of them, and using the images they created and information they obtained to publicize their views about hunting and educate the public."

Professor Brown opposes wolf hunting, making documen-
tary films to further debate. He has been filming wolf hunters
and Wolf Patrol's monitoring activities for several years as
part of his documentary film about the pros and cons of wolf
hunting in Wisconsin. Working with volunteers with Wolf Pa-
trol, he has amassed over 300 hours of documentary video
footage of hunting in Wisconsin. When plaintiffs filed this
case, Brown's objective was to make a feature-length docu-
mentary film about wolf hunting in Wisconsin and the con-
troversies surrounding it.

Plaintiff Stephanie Losse is an environmental and animal-
rights advocate and Wolf Patrol volunteer. In monitoring
hunts as a volunteer with Wolf Patrol, Losse says, she does
not intend to interfere with hunters. Rather, her purposes are
(1) to monitor hunting activities for illegal and inhumane con-
duct and (2) to photograph and film hunting activities to use
in educational materials for the public. When plaintiffs filed
this case, Losse planned to continue monitoring excursions
with Wolf Patrol the following summer during hound-train-
ing season, when clashes between wolves and hounds are
particularly common. Her ability to document these hunting
practices will assist her in communicating her views on hunt-
ing.

Plaintiff Louis Weisberg is the publisher and editor-in-
chief of the *Wisconsin Gazette*, a publication that serves as Wis-
consin wolf activists' "go-to media outlet" for directing public
attention to issues related to hunting and wildlife in the state.
He relies primarily on information gathered by reporters who
go into the field to document and report on hunter activity in
Wisconsin. But because subsection (2)(a)(7) also makes it a
crime to cause another person to engage in a violation of the

subsection, Weisberg "fear[s] sending journalists into the field to document this type of information." Weisberg testified that the statutory limits on documenting hunting and trapping activities significantly chill his ability to report on hunting as an issue of significant public concern.

Plaintiffs Brown and Losse have testified that they intend to continue documenting hunters through photography and videography to share their views about wolf hunting, to educate the public about hunting and trapping in Wisconsin, and to further public debate on the issue. Plaintiff Weisberg has testified that he intends for the *Wisconsin Gazette* to report on hunting more than it currently does, but he is afraid to send his reporters into the field to obtain the needed firsthand documentation of hunting and trapping activity.

2. *Conduct Affected With a Constitutional Interest*

Defendants argue that plaintiffs' activities are pure conduct and are so clearly not protected by the First Amendment that they cannot show standing for a pre-enforcement challenge. We disagree. Plaintiffs' activities utilize "a significant medium for the communication of ideas" as an "organ of public opinion," long recognized as protected by the First Amendment. *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952) (striking down state law requiring license to show films to prevent showing of sacrilegious or immoral films). Because plaintiffs' activities are so closely tied to expression, they are "affected with a constitutional interest." See *Babbitt*, 442 U.S. at 298.

Newspapers like the *Wisconsin Gazette* published by plaintiff Weisberg are the archetypal "organ of public opinion." *Burstyn*, 343 U.S. at 501; see *New York Times Co. v. Sullivan*, 376

U.S. 254, 266 (1964) (calling newspapers "an important outlet for the promulgation of information and ideas"). Photographs and audiovisual recordings of the sort made by plaintiffs Brown and Losse are also a "medium for the communication of ideas" and subject to First Amendment protection. *Burstyn*, 343 U.S. at 501. A statutory prohibition on a particular medium "inevitably affects" expression by restricting communication within and through the medium. See *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 790 (2011) (video games); *Reno v. American Civil Liberties Union*, 521 U.S. 844, 868 (1997) (internet); *City of Ladue v. Gilleo*, 512 U.S. 43, 48 (1994) (signs placed on real property).

First Amendment protection extends to activities necessary to produce and disseminate speech within a protected "medium for the communication of ideas." *Burstyn*, 343 U.S. at 501. Plaintiffs in this case conduct their newsgathering operations and create their photographs and audiovisual recordings with an audience in mind: the people of Wisconsin. They intend for their documentary evidence of hunting activities to function as an "organ of public opinion" on issues surrounding hunting. *Id.* We have held that the "act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording." *American Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) (prohibition on audio recording of police officers in public settings violated First Amendment) (emphasis in original). So long as the medium is understood to enable "expression and communication," use of that medium is protected by the First Amendment, whether the idea communicated is reducible to words or not. See *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989) (protecting music as a

medium). Plaintiffs use photography and audiovisual recording to affect public discourse. "[T]here is no fixed First Amendment line between the act of creating speech and the speech itself." *ACLU v. Alvarez*, 679 F.3d at 596, citing *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061–62 (9th Cir. 2010). The First Amendment covers plaintiffs' photographic and audiovisual recording activities and plaintiff Weisberg's newsgathering activities.[6]

### 3. *Conduct Arguably Proscribed by the Statute*

To support standing for pre-enforcement review, plaintiffs' intended course of conduct must be at least arguably proscribed by the challenged statute. See, e.g., *Babbitt*, 442 U.S. at 298. The hunter harassment statute includes both act and intent elements. Plaintiffs' intended actions of photographing, filming, and monitoring hunting activity fall within the acts that can be reached by subsection (2)(a)(7). Defendants argue, however, that plaintiffs' activities cannot fall within the statute because plaintiffs deny that they intend to impede or obstruct hunting. For reasons described below, we disagree. The statute can cause injury and a chilling effect sufficient for standing even if plaintiffs would have winning defenses in actual prosecutions.

---

[6] Defendants also argue that the statute's inclusion of an affirmative defense based on the First Amendment puts any expressive conduct beyond the scope of the statute. See § 29.083(3m). Of course, the statutory recognition of a First Amendment defense does not weaken the case for standing. That affirmative defense is available in any criminal prosecution, whether the statute refers to it or not. Any person accused of a crime can assert that she is being prosecuted for protected activity or speech.

a. *Activities Covered by Subsection (2)(a)(7)*

Subsection (2)(a)(7) on its face prohibits plaintiffs' planned activities, at least if done with the prohibited intent. Recall that the statute makes criminal "[e]ngaging in a series of 2 or more acts" that include "maintaining a visual or physical proximity to the person" and "photographing, videotaping, audiotaping, or through other electronic means, monitoring or recording the activities of the person" engaged in lawful hunting or trapping. Wis. Stat. § 29.083(2)(a)(7).

In their activity with Wolf Patrol, described above, plaintiffs Brown and Losse routinely photograph and film hunters as a part of their constitutionally protected monitoring and recording activity. To do so, plaintiffs must necessarily maintain "visual … proximity to the person" engaged in hunting. § 29.083(2)(a)(7)(a). The statute also outlaws "causing a person to engage in any of the acts described" in the same subsection, which can apply to plaintiff Weisberg when he sends journalists to report on hunting in Wisconsin. See § 29.083(2)(a)(7)(d). The protected activities of all three plaintiffs fall within the acts subject to the statute.

If there were any doubt that the statute's text applies to plaintiffs' activities, it would be removed by the history of subsection (2)(a)(7). Plaintiffs have offered evidence that the new subsection (2)(a)(7) was aimed directly at them and their associates in Wolf Patrol, adding to the likelihood that their conduct falls within its ambit. The legislative sponsors of the 2016 amendments singled out Wolf Patrol's activities to show the need for those amendments. Dkt. 36-3 at 4.

### b. *Intent and the Risk of Enforcement*

As noted, defendants argue that plaintiffs have nothing to fear from subsection (2)(a)(7) because plaintiffs say they do not intend to "interfere" with or "impede or obstruct" lawful hunting, fishing, or trapping. Wis. Stat. § 29.083(2)(a). We disagree. The Supreme Court and this court have repeatedly held that plaintiffs can show standing for pre-enforcement challenges even where they disclaim the intent needed to violate a challenged statute.

In *Babbitt*, a statute made it an unfair labor practice to encourage consumers to boycott an agricultural product by use of "dishonest, untruthful and deceptive publicity." 442 U.S. at 301. Plaintiffs intended to encourage consumer boycotts. They did not intend to use dishonest, untruthful, or deceptive publicity, but they feared the law would be used to penalize inadvertent misstatements. Those plaintiffs had standing to pursue a pre-enforcement challenge. *Id.* at 302.

In *Susan B. Anthony List*, a state law made it a crime to make false statements about a candidate's voting record during a campaign for public office. 573 U.S. at 152. The plaintiff was an advocacy group that wanted to publicize the voting records of the state's congressional delegation on bills that the plaintiff believed funded abortions. After receiving a complaint about a press release the plaintiff distributed, the Ohio Elections Commission found probable cause that the plaintiff had violated the law. The investigation was eventually dismissed, but the plaintiff intended to distribute public materials with a similar message again in the future. *Id.* at 154–55.

In deciding that the plaintiff had standing, the Supreme Court determined that the plaintiff's conduct, even though it

intended to distribute truthful material, was arguably proscribed by the statute. One factor was the past investigation, which indicated that the plaintiff could be subject to similar enforcement proceedings in the future:

> SBA's insistence that the allegations in its press release were true did not prevent the Commission panel from finding probable cause to believe that SBA had violated the law the first time around. And, there is every reason to think that similar speech in the future will result in similar proceedings, notwithstanding SBA's belief in the truth of its allegations.

*Susan B. Anthony List*, 573 U.S. at 162–63.

To oppose standing, defendants rely on *Schirmer v. Nagode*, 621 F.3d 581 (7th Cir. 2010), arguing that the statute here could be enforced against plaintiffs only if an officer misapplied the statute. This reliance misses the mark. *Schirmer* challenged a Chicago ordinance that required people to disperse when three or more persons were committing acts of disorderly conduct in the immediate vicinity. In that case, the plaintiffs had been arrested, but they were not even arguably violating the law and showed no prospect of facing a similar mistaken arrest in the future. *Id*. at 583. Those plaintiffs had been injured by the individual officers' actions and could seek appropriate remedies for such clear mistakes in applying the law. They had not shown standing for a permanent injunction against all enforcement of the ordinance.

*Schirmer* tried to balance protecting First Amendment rights and avoiding unnecessary constitutional decisions. *Id*. at 586. Our opinion in *Schirmer* distinguished that case, where

there was no plausible argument that plaintiffs had violated the ordinance in question, from cases like this one. We recognized that "when an ambiguous statute arguably prohibits certain protected speech, a reasonable fear of prosecution can provide standing for a First Amendment challenge." *Id.*, citing *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003) (reversing dismissal for lack of standing where scope of statute was unclear); see also *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094–95 (9th Cir. 2003) (reversing dismissal of pre-enforcement challenge for lack of standing; plaintiff reasonably believed statute could and would be enforced against it), citing *American Booksellers Ass'n*, 484 U.S. at 393 (reasonable self-censorship can support standing for pre-enforcement challenge under First Amendment).

We found standing for a pre-enforcement challenge in a case strikingly close to this one, where plaintiffs denied any illegal intent but were subject to a statute that was vague and likely to be pushed to the outer limits of constitutionality and beyond. In *Hoover v. Wagner*, 47 F.3d 845 (7th Cir. 1995), the plaintiffs challenged a state-court injunction that prohibited a specific group of abortion protestors from engaging in their activities close to abortion clinics. Like subsection (2)(a)(7) here, the injunction was designed to protect one group of people as they exercised their rights while others exercised their First Amendment rights. The plaintiffs in *Hoover* were not in the enjoined group but wanted to protest abortions outside the same clinics. They were worried that they would face liability for violating the injunction. In considering whether the plaintiffs had standing to sue, we expressed concerns about the injunction because it was intended to be interpreted to reach as far as possible without violating the First Amendment. *Id.* at 847. The plaintiffs had established standing

because the line separating legal and illegal protests as written in the injunction was too vague, giving officers leeway to arrest people who intended to go right up to the line without crossing it. *Id.* at 847–48.

Here, subsection (2)(a)(7) similarly "pushes [the statute] to its constitutional limits." Dkt. 47-2 at 17 (enforcement guidance from counsel for Wisconsin Department of Natural Resources). State enforcement officials have acknowledged that they "don't know exactly where [the constitutional] ceiling is or when [they] have crossed it." *Id.* Neither do plaintiffs. The vagueness of the statute's intent requirement raises the risks for plaintiffs in exercising their First Amendment rights. Their conduct is at least arguably within the statute's prohibitions. Criminal laws do not need to draw exact boundaries. *Trustees of Indiana University v. Curry*, 918 F.3d 537, 540 (7th Cir. 2019) (rejecting vagueness challenge on merits: "Some uncertainty at the margins does not condemn a statute."). But criminal laws still need a substantial core of ascertainable meaning. *Id.* at 542. They must offer intelligible limits and guide enforcement discretion. We consider the Wisconsin law's vagueness on the merits below, but vagueness is also relevant in evaluating plaintiffs' fears of prosecution and their self-censorship.

To help show their fears and self-censorship are reasonable, plaintiffs offered evidence of enforcement guidance on subsection (2)(a)(7) that the Wisconsin Department of Natural Resources (WDNR) provided to its game wardens and other law enforcement. The guidance acknowledged that, "in application," it would "be difficult" to determine whether an individual has satisfied the requisite "intent and continuity of purpose." WDNR acknowledged that "[o]nly time and enforcement of the statute will tell" whether the statute infringes

the constitutional rights of protestors like plaintiffs. The only direction WDNR offered to game wardens and other law enforcement officials about enforcing the statute is that they should "take seriously" any complaint of harassment, "respond quickly," and "consider whether the facts alleged illustrate actual intent to interfere."

That uncertain guidance merely restated the statute's intent element. In short, as the WDNR acknowledged, given the statute's "very broad language, that incorporates a wide range of conduct," and the lack of clear guidance interpreting the statutory language, enforcement authorities possess "a great deal of authority and discretion to investigate and prosecute the new wave of hunter harassment-silent protest through monitoring." This paucity of guidance and wealth of discretion regarding the definition of "intent to interfere" help persuade us that plaintiffs' fears and self-censorship are reasonable.

### 4. *Plaintiffs' Self-Censorship*

Plaintiffs may show standing for a pre-enforcement First Amendment challenge to a law when they resort to self-censorship out of "an actual and well-founded fear" that the law will be enforced against them. *American Booksellers Ass'n*, 484 U.S. at 393. Here, plaintiffs offered evidence that their fears of enforcement are "actual." They testified that their behavior has been chilled by subsection (2)(a)(7) as they have engaged in self-censorship. Plaintiffs' evidence of active enforcement of subsection (2)(a)(7), broad enforcement discretion, and dispersed set of enforcement officials, shows that plaintiffs' fears of enforcement are reasonable and "well-founded."

### a.  *Self-Censorship and "Actual" Fear of Enforcement*

Here, all three plaintiffs have testified that they have engaged in self-censorship in response to sustained law enforcement pressure aimed at assuring compliance with subsection (2)(a)(7) and have done so to avoid the threat of prosecution and civil liability under subsection (2)(a)(7). Plaintiffs Losse and Brown have limited their monitoring, filming, and documenting activities. When they do venture out to monitor and document hunting activity, even on federal land, both plaintiffs keep to the public roads, in or close to their vehicles, and avoid the forests. Losse testified that she now goes on fewer monitoring trips and limits her photography and videography when she does. She monitors hunting only on federal land, avoiding state-owned lands because she has "been stopped and threatened with citations" only by state and local enforcement authorities. The same is true of Brown, who also sticks to federal land and no longer documents hunting activity in Polk or Forest Counties. And plaintiff Weisberg testified that he has a growing interest in reporting on hunting, and presumably intends for the *Wisconsin Gazette* to report on hunting more than it currently does, but he is afraid to send his reporters into the field to obtain the necessary firsthand documentation of hunting and trapping activity. In short, plaintiffs' adjusted behavior reflects the chilling of protected speech, demonstrating an "actual" fear of enforcement.

### b.  *Well-Founded Fears of Enforcement*

A history of enforcement proceedings against similar conduct weighs in favor of a finding that plaintiffs' fears of enforcement are well-founded. *American Booksellers Ass'n*, 484 U.S. at 394; accord, e.g., *Susan B. Anthony List*, 573 U.S. at 162–63; *Fischer v. Thomas*, 52 F.4th 303, 308–09 (6th Cir. 2022)

(credible threat of enforcement where plaintiff had previously been investigated for conduct similar to his intended conduct); *Free Speech Coalition, Inc. v. Attorney General of the United States*, 825 F.3d 149, 166 (3d Cir. 2016) ("fact that some [plaintiffs] have been subjected to records inspections in the past makes the threat of future inspections more credible"); see generally *Humanitarian Law Project*, 561 U.S. 1 (plaintiff had standing where it intended to continue supporting organizations designated as foreign terrorist organizations and government had prosecuted others for similar actions); *Steffel v. Thompson*, 415 U.S. 452 (1974) (plaintiff had standing after police officers threatened to arrest him for distributing handbills, then arrested another person who did not stop distributing them).

Evidence of active enforcement, even short of prosecution, helps to show that plaintiffs' fears of prosecution are reasonable. Evidence shows that the hunter harassment statute is the subject of active pressure for citations, investigations, and enforcement. The law does not rest forgotten in desk drawers in game wardens' offices. According to plaintiffs' evidence, the law has been used to harass and restrict them without actually charging them in a prosecution where constitutional challenges could be resolved. Given the tension between hunting rights and First Amendment rights, confrontations with enforcement officials that push the limits of the hunter harassment law are not unusual.

The fear of prosecution becomes more realistic where a larger group of officials has enforcement power, especially with broad discretion, as WDNR acknowledges. Defendants argue that subsection (2)(a)(7)'s intent requirement limits enforcement officials' discretion over prosecutions. Subjective

intent, however, must usually be inferred from objective evidence. We know that subsection (2)(a)(7) was aimed at opponents of hunting, whether they intend to disrupt hunting or not. The vague scope of subsection (2)(a)(7) and the widely dispersed authority to enforce it add to plaintiffs' reasonable fears of both prosecution and further harassment under the provision's umbrella.

We recognize that WDNR and its game wardens have important enforcement discretion here. They also seem to want to exercise caution in the face of constitutional concerns about subsection (2)(a)(7). But as plaintiffs point out, district attorneys in every county have the power to prosecute violations of the hunter harassment law. Sheriffs' deputies all over the state have the power to issue citations for suspected violations and, perhaps equally important, to detain and investigate people for suspected violations. Defendants' argument also overlooks the citizen-suit provision, allowing any "person who is adversely affected by, or who reasonably may be expected to be adversely affected by, conduct that is in violation of" subsection (2)(a) to "bring an action in circuit court for an injunction or damages or both." Wis. Stat. § 29.083(4)(a) (2016). That means that government authorities are not the only ones who may seek to enforce the hunter harassment law. Hunters too may invoke the law's broad language and inherent discretion to decide on their own whether to try to enforce the law against plaintiffs. In recent Supreme Court decisions, much more limited private rights have contributed to standing for pre-enforcement First Amendment challenges. See *303 Creative LLC v. Elenis*, 600 U.S. 570, 583 (2023) (provision allowing "any person" to file complaint and initiate potentially burdensome administrative process supported standing); *Susan B. Anthony List*, 573 U.S. at 164–65 (citizens'

right to file complaint with state enforcement authorities supported standing).

Plaintiffs have demonstrated a well-founded fear of enforcement for protected activities. While no plaintiff has actually been charged with a violation of subsection (2)(a)(7), Brown and Losse have been stopped repeatedly for questioning by law enforcement while engaged in activities protected by the First Amendment. Both have had encounters with hunters and law enforcement that took them to the brink of being formally charged with violating subsection (2)(a)(7) while engaging in actions protected by the First Amendment. In Losse's case, an officer was actually trying to issue her a citation when a technical glitch prevented him from doing so. In Brown's case in the Forest County incident, law enforcement seized his cameras, memory cards, and other equipment and kept them for seven months before the district attorney finally decided not to charge him.

Because of the history of attempted prosecutions against them for similar conduct, the active enforcement of subsection (2)(a)(7), and the statute's grant of widely distributed and broad enforcement discretion, plaintiffs have shown that their fear of enforcement against them is reasonable.

### 5. *No Clear Disavowal of Prosecution*

The Supreme Court and this court have suggested that a plaintiff may nonetheless lack a well-founded fear of prosecution when those who have authority to enforce the law have clearly disavowed any plans to prosecute the plaintiff. Conversely, the absence of a clear disavowal tends to support finding a credible threat of prosecution. See *303 Creative LLC*, 600 U.S. at 583 (approving Tenth Circuit's finding of standing

where State had declined to disavow future enforcement proceedings against plaintiff); *American Booksellers Ass'n*, 484 U.S. at 387, 393 (booksellers had standing to bring pre-enforcement challenge to ban on display of material "harmful to juveniles" where State had "not suggested that the newly enacted law [would] not be enforced"); *Babbitt*, 442 U.S. at 302 (plaintiffs had reason to fear prosecution in part because State had "not disavowed any intention of invoking the criminal penalty provision" against them); *Center for Individual Freedom v. Madigan*, 697 F.3d 464, 473–75 (7th Cir. 2012) (plaintiffs had well-founded fear of prosecution where statute's enforcers had not determined that statute did not apply to plaintiffs). The same is true here. There has not been a clear or widespread disavowal that would remove the threat of liability for plaintiffs.

Here, the Forest County District Attorney said he would not prosecute plaintiff Brown for potential violations of the statute in the January 2018 incident, but his disavowal covered only that incident. The disavowal was not forward-looking and does not therefore diminish the otherwise credible threat of prosecution plaintiffs face. Nor does it provide guidance for enforcing the statute.

The same is true of a disavowal by WDNR at a July 2017 meeting attended by WDNR staff, the United States Forest Service, the Bayfield County Sheriff and District Attorney, representatives of Wolf Patrol, and plaintiffs Brown and Losse. After reviewing videos of interactions between hunters and Wolf Patrol, the officials present agreed that none of the conduct in the videos would violate the hunter harassment law. After the meeting, Wolf Patrol member Rod Coronado said that Wolf Patrol "got confirmation from all three agencies

present that what they've seen Wolf Patrol do is not illegal." But plaintiffs were more circumspect. They took what was said at the meeting as—at most—"some confirmation that a particular county was not maybe going to prosecute."

These facts do not show a clear disavowal of enforcement that would undermine plaintiffs' reasonable fear of prosecution. The WDNR meeting statements addressed only the activities shown in the videos played at the meeting. The Forest County disavowal applied only to Brown and the January 2018 incident. More important, the disavowals at the WDNR meeting came from only a handful of the officials who have authority to enforce the statute. The authorities present at the July 2017 meeting were from the WDNR, the United States Forest Service, and Bayfield County. Even if all those authorities agreed that none of the conduct in the videos violated the hunter harassment law, their agreement did not extend to the many absent officials who could choose to enforce the statute against plaintiffs. Every district attorney in the state can file charges in response to complaints by hunters in their counties. Hundreds of sheriffs' deputies and game wardens can issue citations. Individual hunters can bring civil actions for damages and injunctions. As plaintiff Brown explained in his deposition, he has often encountered both state and local officers when disputes have arisen between hunters and either him or members of Wolf Patrol. While local officers may consult with the WDNR about how to apply subsection (2)(a)(7), any WDNR guidance—even if it were clear—would not bind them.

6. *Redressability*

The dissenting opinion raises an objection to standing that defendants have not raised: that plaintiffs have not shown

how a court could redress their injuries. Post at 90–91. In fact, they provided a straightforward answer. A judicial declaration that subsection (2)(a)(7) is unconstitutional and an injunction against its enforcement would remove its availability for use to question, and consequently, to chill plaintiffs' protected activities that do not threaten physical interference with hunters. Such judicial relief is routine when a law violates the First Amendment. If such relief is granted, it would of course be possible that a few rogue law enforcement officers might still mistakenly try to enforce it. That possibility does not undercut redressability or standing. We can expect the vast majority of officials to comply with a federal court injunction and declaratory judgment. Cf. *Schirmer*, 621 F.3d at 586–87 (rejecting standing to challenge state law under First Amendment where the law clearly did not apply to plaintiffs' actions and arresting officers were clearly mistaken in arresting plaintiffs). Redressability requires a plaintiff to show that her injury is "likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38 (1976). An injunction and declaratory judgment here are highly likely to stop the ongoing harassment and chilling effects that plaintiffs have experienced and to prevent their prosecution for constitutionally protected activities.

To sum up, plaintiffs have offered evidence to show standing to bring their as-applied and facial challenges to subsection (2)(a)(7). They have offered evidence of an actual and well-founded fear of prosecution for activities protected by the First Amendment and arguably proscribed by subsection (2)(a)(7). Defendants have not raised any genuine issues of fact material to plaintiffs' standing.

IV. *Vagueness & Overbreadth*

We turn now to the merits of plaintiffs' challenges to sub-section (2)(a)(7). Plaintiffs raised challenges to the statute as both unconstitutionally vague and overbroad. We agree with plaintiffs that all three provisions of subsection (2)(a)(7) are unconstitutionally vague and/or overbroad so that their enforcement should be enjoined.

Statutes can violate the First Amendment as unconstitutionally overbroad in at least two distinct ways. The first is usually referred to as vagueness. Vague rules are overbroad because their scope is uncertain and because they tend to produce large chilling effects. See *NAACP v. Button*, 371 U.S. 415, 432–33 (1963). The part of overbreadth doctrine concerned with vagueness is "predicated on the danger that an overly broad statute, if left in place, may cause persons whose expression is constitutionally protected to refrain from exercising their rights for fear of criminal sanctions." *Massachusetts v. Oakes*, 491 U.S. 576, 581 (1989). All vague statutes are overbroad in the sense described in *Button* and *Smith v. Goguen*: they are likely to have a substantial chilling effect on constitutionally protected activity. 371 U.S. at 432–33; 415 U.S. 566, 572–76 (1974). Vagueness thus can be thought of as one form of overbreadth, describing rules that are overbroad because their effect is to chill constitutionally protected activity.

Laws can also be overbroad in a second, distinct sense: not because their scope is vague, but because the conduct they prohibit consists mostly of constitutionally protected activities. This sort of rule is overbroad even in the absence of vagueness and resulting chilling effects. See *Massachusetts v. Coakley*, 491 U.S. at 587–88 (Scalia, J., concurring) (writing for a majority and holding that even if later narrowing of statute

by amendment eliminated all chilling effects, it "does not eliminate the defense of overbreadth"). To test this sort of overbreadth, courts compare the scope of the rule as drafted to the scope of a hypothetical, constitutionally permissible rule. See *United States v. Stevens*, 559 U.S. 460, 473 (2010) (a law may be invalidated as overbroad "if a substantial number of its applications are unconstitutional, judged in relation to its plainly legitimate sweep") (internal citations and quotation marks omitted). If the law as drafted reaches substantially beyond the scope of the constitutionally permissible law, such that the actual law's broader scope reaches mostly constitutionally protected activity, the law is substantially overbroad and subject to facial invalidation. *Id.* at 473–74.

The three substantive prohibitions of subsection (2)(a)(7) are all unconstitutionally overbroad, but not all in the same way. Clauses (a) and (b) prohibit "maintaining a visual or physical proximity" and "approaching or confronting" persons engaged in lawful hunting activity. These provisions are overbroad in the sense of *Button* and *Goguen*. They are unconstitutionally vague. They fail to provide reasonable notice as to what conduct is criminal, and they fail to provide reasonable constraints on the discretion of enforcement officials. They thus tend to create significant chilling effects on constitutionally protected activity, as they have for these plaintiffs. See *Hill v. Colorado*, 530 U.S. 703, 732 (2000). They fail for overbreadth due to vagueness.

The third provision of subsection (2)(a)(7), clause (c), is not vague. The conduct it proscribes is clear: "photographing, videotaping, audiotaping, or through other electronic means, monitoring or recording the activities of the person" engaged in lawful hunting or trapping, when done to interfere

intentionally with the hunting or trapping. Clause (c) is over-broad in the second sense of the term, as in *Stevens*: a substantial number of the law's applications are unconstitutional, measured against the law's plainly legitimate sweep. 559 U.S. at 473. We analyze subsection (2)(a)(7) for these two distinct forms of overbreadth separately.

A. *Vagueness: Clauses (a) and (b) of Subsections (2)(a)(7)*

A vague regulation of expression "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 871–72 (1997). Where the regulation imposes criminal sanctions, those concerns multiply. The penalties, "opprobrium and stigma of a criminal conviction … may well cause speakers to remain silent" rather than to engage in expressive conduct. *Id.* at 872.

The mechanisms by which vague rules cause chilling effects are two-fold. A statute can be impermissibly vague where it either (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. at 732.

We focus here on clauses (a) and (b) in subsection (2)(a)(7), which apply, respectively, to "maintaining a visual or physical proximity" to a hunter and "approaching or confronting" a hunter. These provisions are unconstitutionally vague. They both lack sufficient detail to let people of ordinary intelligence know what conduct is prohibited and encourage arbitrary and discriminatory enforcement. See *Hill*, 530 U.S. at 732.

### 1.  *Need for Specifying Proximity to Guide Conduct*

To survive a vagueness challenge, a criminal statute must give people fair notice of what conduct is prohibited so that they may conduct themselves within the law's bounds. See *Johnson v. United States*, 576 U.S. 591, 595 (2015); *City of Chicago v. Morales*, 527 U.S. 41, 58 (1999) ("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes."), quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939).

Recalling that this case presents a conflict between rights—a right to hunt and free speech rights—we find helpful guidance in cases addressing the proximity and conduct of people engaged in monitoring and protesting the exercise of other constitutional rights, such as rules protecting access to abortion facilities.

Where a statute prohibits approaching or being near another person and addresses expressive conduct, specificity is especially important. See *Hill*, 530 U.S. at 732–33; see also *Smith v. Goguen*, 415 U.S. at 573 ("Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts."); *Button*, 371 U.S. at 433 ("Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity."). Often, the indeterminacy of what conduct constitutes a violation makes a statute vague. *United States v. Williams*, 553 U.S. 285, 306 (2008) ("What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it

establishes has been proved; but rather the indeterminacy of precisely what that fact is.").

With this in mind, defendants' reliance on *Hill v. Colorado* is misplaced. The Supreme Court's decision actually weighs in favor of plaintiffs' challenge here. In *Hill*, a statute prohibited people near health care facilities from knowingly approaching "within eight feet of another person, without that person's consent," to protest or to give that person unsolicited "counseling." 530 U.S. at 707. The plaintiffs argued the statute was vague because it did not detail how someone would know whether she was approaching within eight feet of another person. The Court rejected this argument for two reasons. First, the statute's "knowing" requirement limited its application to people who knowingly, not inadvertently, approached another person too closely. Second, the statute's specific eight-foot limit made it much easier to distinguish between lawful and unlawful conduct. *Id.* at 732–33; see also *McCullen v. Coakley*, 573 U.S. 464, 471–72 (2014) (upholding statute prohibiting people from coming within 35 feet of reproductive-care facilities where facilities were required to mark prohibited areas, eliminating uncertainty).

Clauses (a) and (b) of subsection (2)(a)(7) both lack the specificity of the laws upheld in *Hill* and *McCullen*. They broadly prohibit "maintaining a visual or physical proximity to" or "approaching" a hunter. They fail to specify, or even to offer any guidance about, how far away a person must stay to avoid engaging in unlawful interference. Compare, e.g., *United States v. Guagliardo*, 278 F.3d 868, 872–73 (9th Cir. 2002) (supervised release condition that defendant not "reside in 'close proximity' to places frequented by children" was vague), with *United States v. Bee*, 162 F.3d 1232, 1235 (9th Cir.

1998) (upholding condition that defendant "not loiter within 100 feet" of places used by children). A person of ordinary intelligence cannot be expected to discern from the Wisconsin statutory language of clauses (a) and (b) what conduct is prohibited and what is not. See *Hill*, 530 U.S. at 732.

Defendants argue that "visual or physical proximity" means "close enough" to impede or obstruct a hunter. That logic takes into account the statutory element of intent to interfere with hunting. But it still leaves the law impermissibly vague. What does "close enough" mean in the context of hunting? Five feet? Fifty feet? Five hundred feet? Five hundred yards? With modern rifles, the distance could be well beyond earshot. Stealth is part of hunting. See *State v. Froebel*, 387 Wis. 2d 686, 928 N.W.2d 810, 810 (Wis. App. 2019) ("Even a lay person knows that hunting requires quiet and calm.").

The statute is also silent about who determines when a person is "close enough." Defendants suggest that it is the subjective perspective of the hunter. That only adds to the vagueness. How is a photographer or videographer supposed to know when she is too close? By guessing whether the hunter perceives her to be interfering? Or should it be from the subjective perspective of the photographer and the videographer? The statute provides no objective criteria to plaintiffs, hunters, or enforcement authorities to determine when someone like plaintiffs is too close.

The lack of specificity is not cured here by any meaningful guidance from enforcement authorities or state courts. To be sure, the WDNR has issued memos and said in the meeting—attended by the Bayfield County Sheriff and District Attorney, plaintiffs Brown and Losse, and representatives of Wolf Patrol and the United States Forest Service—that following hunters

and filming them does not constitute "interference." That guidance is hard to square with the statutory language itself, which makes unmistakably clear that at least some following and filming can amount to interference. More fundamental, the guidance does not clarify the statutory language about "visual or physical proximity" and "approaching." Plaintiffs, hunters, law enforcement, and courts have to assume the statute means what it says. Under subsection (2)(a)(7) "maintaining a visual or physical proximity" to a hunter, i.e., *following* a hunter, and "recording the activities" of that hunter, can amount to a crime. WDNR's guidance does not remove the vague elements from subsection (2)(a)(7) but in fact shows the problem with the statute. People simply cannot know how close is too close to follow and film.

Nor have state courts interpreted either the amended statute or the original statute in a way that clarifies these inherent ambiguities. *Bagley* held that the original hunter harassment law requires physical interference, but as explained above, that physical obstruction requirement does not apply to new clauses (a) and (b) of subsection (2)(a)(7), which address activities and conduct that do *not* amount to physical obstruction. See *Bagley*, 474 N.W.2d at 764–65. Even when *Bagley*'s physical obstruction requirement does apply, it has been construed broadly. See *Froebel*, 928 N.W.2d at 810 (considering violation of subsection (2)(a)(2)). In short, *Bagley* cannot cure the vagueness of these new provisions.

Adding specific distances to the statute's "proximity" and "approaching" provisions is the task of a legislature, not a court. *Kolender v. Lawson*, 461 U.S. 352, 358 & n.7 (1983) (striking down statute requiring persons on street to provide police "credible and reliable" identification upon request; statute

"vests virtually complete discretion in the hands of the police"); *Smith v. Goguen*, 415 U.S. at 574 (striking down statute outlawing "contemptuous" treatment of flag; legislature must "establish minimal guidelines to govern law enforcement"); *United States v. Reese*, 92 U.S. 214, 221 (1875) ("It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large. This would, to some extent, substitute the judicial for the legislative department of government.").

The absence of more specific detail in the statute, as well as the lack of statutory grounds for either interpretive guidance or a limiting construction, means that people like plaintiffs who want to engage in expressive activity cannot know when they are too close to a hunter, physically or visually, or are "approaching" a hunter too closely. On this basis alone, clauses (a) and (b) are unconstitutionally vague.

### 2. *Arbitrary Enforcement*

The vague statutory language also leaves too much room for arbitrary and discriminatory enforcement, chilling plaintiffs who are reasonably concerned about over-enforcement. The lack of objective criteria in subsection (2)(a)(7) means that enforcement authorities, like individual citizens, cannot know when the line between lawful and unlawful conduct has been crossed. See *Kolender*, 461 U.S. at 358 (legislature must "establish minimal guidelines to govern law enforcement"), quoting *Goguen*, 415 U.S. at 574.

These fair-notice and separation-of-powers aspects of statutory vagueness are two sides of the same coin. Each tends to

produce substantial chilling effects. In *Hill*, for example, where the Supreme Court concluded that the statute's specificity ("eight feet") allowed people to understand when their conduct violated the law, the Court also determined that, for the same reason, the statute gave "adequate guidance to law enforcement authorities." 530 U.S. at 732–33. While enforcement always "requires the exercise of some degree" of judgment, the Court said, "the degree of judgment involved" was "acceptable." *Id.* at 733, quoting *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972).

Here, the opposite is true. As the WDNR recognizes, the amendments to the hunter harassment law were designed to push the "constitutional limits" and to give enforcement officials "a great deal of authority and discretion." The problem is that officials "don't know exactly where [the constitutional] ceiling is or when [they] have crossed it." On this record, the only guidance the WDNR has managed to offer enforcement authorities is to "tread carefully." In saying this, we do not mean to criticize WDNR officials but only recognize the insoluble problem the legislation has handed to them. And treading carefully is precisely what plaintiffs have been doing—often just staying in their cars—lest they commit a crime by crossing a line they cannot discern. Such chilling effects are a clear sign that the statute's vagueness pushes people who monitor and document hunting in Wisconsin to engage in reasonable self-censorship. Unlike the limited discretion afforded officials in *Hill*, the expansive discretion given to enforcement authorities under the amended hunter harassment law produces substantial chilling effects. See *Hill*, 530 U.S. at 733.

If the uncertainty and threat of arbitrary enforcement by public officials were not enough, plaintiffs are also subject to arbitrary enforcement at the hands of hunters and hunting parties. The hunter harassment law's citizen suit provision, Wis. Stat. § 29.083(4)(a), means that these plaintiffs also must worry about being sued privately by hunters motivated to discourage even activity protected by the First Amendment.

Plaintiffs have also offered evidence that the hunter harassment law has enabled hunters to prevent or discourage expressive activity without resorting to bringing civil actions. Hunters have repeatedly stopped, surrounded, and prevented plaintiffs from going freely about their business, sometimes detaining them for "hours at a time." These citizen's arrests—or perhaps citizen's *Terry* stops?—have been followed by actual officers stopping plaintiffs to question them, sometimes at length, about their activities.

In short, for the same reasons that clauses (a) and (b) fail to provide people with objective criteria to guide their behavior, they also allow for "arbitrary and discriminatory enforcement." See *Hill*, 530 U.S. at 732–33; see also *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170 (1972) ("Where, as here, there are no standards governing the exercise of the discretion granted by the ordinance, the scheme permits and encourages an arbitrary and discriminatory enforcement of the law.").

In response to these problems with subsection (2)(a)(7), defendants argue that the intent requirement provides a limiting principle that allows officials to enforce and plaintiffs to abide by the law. This argument fails for two reasons. First, the intent element does nothing to eliminate or reduce vagueness issues with the conduct elements of criminal statutes. See *Smith v. Goguen*. 415 U.S. at 580 (state court construction of

criminal statute to include intent element did not resolve vagueness of conduct element). Second, the intent element in subsection (2)(a)(7) is itself vague. The requirement that the series of acts be "intended to impede or obstruct" hunting lacks any objective criteria by which enforcement officials could reasonably parse lawful intent from unlawful intent based on alleged violators' behavior.

As noted above, lawmakers borrowed much of subsection (2)(a)(7)'s structure and wording from Wisconsin's stalking statute, Wis. Stat. § 940.32.[7] But there are some key differences. Critically, subsection (2)(a)(7) did away with the objective portion of the stalking statute's intent requirement. Unlike subsection (2)(a)(7), the stalking statute incorporates an objective intent standard that guides enforcement officials, judges, and juries in distinguishing between criminal stalking and lawful activities. Under the stalking statute, the actor must "intentionally" engage in a series of qualifying acts "directed at a specific person" where the actor also at least should know that those acts "would cause a reasonable person under the same circumstances to suffer serious emotional distress or to fear bodily injury to or the death of himself or herself or a member of his or her family or household." Wis. Stat. § 940.32(2)(a)–(b).

---

[7] Like subsection (2)(a)(7), the stalking statute prohibits engaging in "a series of 2 or more acts carried out over time, however short or long, that show a continuity of purpose …." § 940.32(1)(a). Qualifying acts include acts similar to those listed in subsection (2)(a)(7): "1. Maintaining a visual or physical proximity to the victim. 2. Approaching or confronting the victim. …. 6m. Photographing, videotaping, audiotaping, or, through any other electronic means, monitoring or recording the activities of the victim. … regardless of where the act occurs." § 940.32(1)(a)(1)–(2), (6m).

As the Wisconsin Court of Appeals has observed, the stalking statute's reasonable person standard provides enforcement authorities with "an objective standard to be applied in evaluations of alleged violations." *State v. Ruesch*, 214 Wis. 2d 548, 571 N.W.2d 898, 905 (Wis. App. 1997). That statute's inclusion of "specific intent, knowledge and effect" elements "significantly vitiates" a claim that the law is unclear about what conduct is proscribed. *Id.* at 903, 905.

The same simply is not true of subsection (2)(a)(7) of the hunter harassment law. When the legislature borrowed some language from the stalking statute but omitted the objective intent standard, the omission signals that the legislature did not want that objective intent standard for hunter harassment. Intent must ordinarily be gauged by objective indications. When the statute lacks any objective standard for enforcement officials attempting to determine a potential violator's intent, it provides no check on official discretion and no guidance to people like plaintiffs who are trying to comply with the rule. How are enforcement officials to determine intent when one person stays three hundred feet away from another, or one hundred feet, or thirty feet? Or repeatedly photographs another? Particularly if the observer or photographer is known to oppose hunting? Without any objective criteria, subsection (2)(a)(7) cannot give either civilians or enforcement authorities the guidance they need to avoid a violation or to know when a violation has occurred. In short, subsection (2)(a)(7)'s intent requirement does not solve the vagueness problem.

The statute fails to give appropriate guidance to the people it regulates and fails to cabin adequately the discretion of enforcement officials. It creates an unacceptable risk that the

statute will "cause persons whose expression is constitutionally protected to refrain from exercising their rights for fear of criminal sanctions." *Massachusetts v. Oakes*, 491 U.S. at 581. Here, plaintiffs have already testified to the strength of such chilling effects on their own behavior. Clauses (a) and (b) of subsection (2)(a)(7) of the amended hunter harassment law are unconstitutionally vague.

B.  *Overbreadth of Clause (c) of Subsection (2)(a)(7)*

Next, we analyze clause (c) of subsection (2)(a)(7) for overbreadth in the second sense, asking whether "a substantial number of its applications are unconstitutional, judged in relation to its plainly legitimate sweep." *Stevens*, 559 U.S. at 472. "[T]he first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Id.* at 474, quoting *United States v. Williams*, 553 U.S. 285, 293 (2008). We analyze the Wisconsin statute in light of any narrowing constructions by Wisconsin's courts. But as discussed above, Wisconsin state courts have not yet provided any narrowing interpretations of clause (c) of subsection (2)(a)(7), nor do we see ground in the statutory text for narrowing it. And as explained above, *Bagley*'s physical obstruction requirement does not apply to this new subsection. See *Bagley*, 474 N.W.2d at 764.

To determine the scope of clause (c), we start with its text. *Stevens*, 559 U.S. at 474. Clause (c) prohibits "photographing, videotaping, audiotaping, or through other electronic means, monitoring or recording the activities of" a hunter or member of a hunting party. Such monitoring activities are prohibited "regardless of where the act occurs." On its face, the text of the statute carves out no exemptions for monitoring and

recording activities that aim to contribute to public discourse. It treats newsgathering and silent-protest monitoring the same as recordings made for solely individual use.

As we explained regarding plaintiffs' standing, their monitoring and recording activities are intended to contribute to public discourse on hunting in Wisconsin. The text of clause (c) is not ambiguous, and we should take the statute at its word. "Thus, the protection of the First Amendment presumptively extends to many forms of speech that … fall within the broad reach of" clause (c) of subsection (2)(a)(7), rendering many of its applications unconstitutional. *Stevens*, 559 U.S. at 480. Plaintiffs' activities fall within the scope of the statute and are protected by the First Amendment.

We must also consider the scope of those unconstitutional applications "in relation to [the statute's] plainly legitimate sweep." *Stevens*, 559 U.S. at 473. That is, we must compare the breadth of clause (c)'s scope to a rule that would be constitutionally permissible. Here, we need not speculate on what such a constitutionally permissible rule would look like. We can simply compare Wisconsin's hunting statute before subsection (2)(a)(7) was added. The original hunting statute had already been upheld as constitutional. As interpreted by *Bagley*, the statute could and did prohibit physical interference with hunting while remaining within the limits of the Constitution. See *Bagley*, 474 N.W.2d at 764.

Comparing clause (c) to the scope of the statute before the amendment, we see that clause (c)'s only plausible purpose is expanding the scope of the statute to outlaw photography, videography, audiotaping, or other monitoring or recording activities that *do not physically interfere* with hunting activities. Otherwise, such monitoring or recording activities would

have already been forbidden under the pre-amendment statute, rendering subsection (2)(a)(7) mere surplusage. As noted, that would run contrary to sound statutory interpretation, particularly in Wisconsin. *Kalal*, 681 N.W.2d at 124 (under Wisconsin law, statutory interpretation must focus on language of the statute, which is read where possible "to give reasonable effect to every word, in order to avoid surplusage").

Once we recognize that clause (c) reaches only recording and monitoring activities that do not physically interfere with hunting or trapping, it becomes immediately apparent that the "presumptively impermissible applications" of clause (c) "far outnumber any permissible ones." *Stevens*, 559 U.S. at 481. When asked at oral argument for even a single hypothetical scenario in which clause (c) could constitutionally prohibit conduct not already criminalized, defendants suggested that clause (c) could apply where "somebody is committing battery while holding a camera." *Recording of Oral Argument* at 23:08–23:12. Aside from this trivial and improbable example, which would not actually involve expressive conduct and would already be criminal as battery, defendants have not mustered a hypothetical scenario in which clause (c) would have any effect other than to chill First Amendment activities. A small number of constitutional applications (or in this case, only one trivial and improbable one) are insufficient to save a statute whose applications are otherwise unconstitutional. *Stevens*, 559 U.S. at 481–82. In sum, because all three clauses of subsection (2)(a)(7) are unconstitutionally overbroad, the entire subsection is invalid on its face.

V. *Viewpoint Discrimination*

Even if the clauses of subsection (2)(a)(7) were not unconstitutionally vague or overbroad, they would violate the First Amendment because they unconstitutionally discriminate between protected expressive activities based on viewpoint. Viewpoint discrimination, where the government "targets not subject matter, but particular views taken by speakers on a subject," is "an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). The First Amendment limits the power of the government to restrict expression because of the viewpoint it expresses. E.g., *Shurtleff v. City of Boston*, 596 U.S. 243, 258 (2022); *City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994). "The rationale" of these First Amendment limits "is that content discrimination raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1992) (internal citations omitted). "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829.

Plaintiffs argue that subsection (2)(a)(7) discriminates based on viewpoint because it "criminalizes speech only when the speaker can be inferred to have an intent to *disrupt*" hunting activities, and not when the speaker (or photographer or videographer) intends to *support* those same activities. We agree. On that basis, subsection (2)(a)(7) is viewpoint-discriminatory.

A.  *Conduct or Expression?*

Before reaching the merits of plaintiffs' viewpoint discrimination claim, we must return to defendants' argument that the hunter harassment law reaches only conduct, not speech. The only prohibited "conduct," as defendants see it, is "acts intended to impede or obstruct," and, they contend that such acts cannot be expressive. Conversely, plaintiffs argue that subsection (2)(a)(7) targets protected First Amendment activities, including "photography, videography, and newsgathering," based on the "content of the speech"—content "concerning hunters and hunting activities."

Defendants' argument is not persuasive. We begin with clause (c) in subsection (2)(a)(7). As explained above regarding standing, the acts listed in clause (c)—photographing and otherwise recording hunting— make use of a protected "medium for the communication of ideas" for purposes of shaping public discourse and therefore constitute at least expressive conduct. Because plaintiffs use photography and audiovisual recording to try to affect public opinion, there is no "fixed First Amendment line between the act of creating speech and the speech itself." *ACLU v. Alvarez*, 679 F.3d at 596, citing *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061–62 (9th Cir. 2010). The "act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording." *ACLU v. Alvarez*, 679 F.3d at 595 (emphasis in original).

In short, clause (c) of subsection (2)(a)(7) targets fundamental speech activities. The acts enumerated in that clause —"photographing, videotaping, audiotaping, or through other electronic means, monitoring or recording"— are

essential to the creation of speech and also expressive in their own right. See *ACLU v. Alvarez*, 679 F.3d at 595–96. Because the First Amendment protects conduct and activities necessary for expression, it also extends to the other clauses of subsection (2)(a)(7), since "visual or physical proximity" and approaching hunters are also essential to carry out plaintiffs' protected monitoring and recording of hunting.

Even if the activity covered by clauses (a) and (b) were better described as conduct than speech, conduct can still be covered by the First Amendment when the government "target[s the] conduct on the basis of its expressive content." *R.A.V.*, 505 U.S. at 390. In *R.A.V.*, the Supreme Court struck down a Minnesota state prohibition on fighting words (which are not protected by the First Amendment) because the law targeted a certain category of fighting words on an improper basis, that is, for an improper purpose. *Id.* at 391–96. The Court confirmed that First Amendment coverage can be triggered by regulations that target conduct on an improper basis, independent of the nature of the regulated conduct: "We have long held … that nonverbal expressive activity can be banned because of the action it entails, but not because of the ideas it expresses—so that burning a flag in violation of an ordinance against outdoor fires could be punishable, whereas burning a flag in violation of an ordinance against dishonoring the flag is not." *R.A.V.*, 505 U.S. at 385, citing *Texas v. Johnson*, 491 U.S. 397, 406–07 (1989). "It is, in short, not simply the verbal or nonverbal nature of expression, but the governmental interest at stake, that helps to determine whether a restriction on that expression is valid." *Johnson*, 491 U.S. at 406–07. First Amendment coverage of expressive conduct is triggered whenever there is a "realistic possibility that official suppression of ideas is afoot." *R.A.V.*, 505 U.S. at 390.

Here, as explained above, both the statutory text and evidence from its enactment show that it was specifically intended to target the expressive activities of members of Wolf Patrol and other anti-hunting advocates. Because the question whether the hunter harassment statute targets expressive conduct for an improper purpose, triggering First Amendment coverage, blurs into whether the regulation is content- and viewpoint-neutral, we consider the governments' purposes for the amended hunter harassment act in more depth in the following section.

B. *Viewpoint-Based Regulations of Speech*

A speech regulation is viewpoint-based when it goes beyond general discrimination against speech about a specific topic and instead regulates one perspective within a debate about a broader topic. *Rosenberger*, 515 U.S. at 829–31. We agree with plaintiffs that subsection (2)(a)(7) does just that.

First, the Supreme Court has taught courts to consider whether a regulation is facially neutral toward categories of content and particular viewpoints. "A regulation of speech is facially content based under the First Amendment if it 'targets speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022), quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). If applying the regulation requires an examination or distinguishing of speech "only in service of drawing neutral … lines," the statute is considered "agnostic as to content." *Id.* Otherwise, the regulation is considered content- or viewpoint-discriminatory on its face and warrants strict scrutiny. *Id.*

A determination that a regulation is facially content-neutral does not end the First Amendment inquiry. *Id.* at 76. "If there is evidence that an impermissible purpose or justification underpins a facially content-neutral restriction, for instance, that restriction may be content based." *Id.*, citing *Reed*, 576 U.S. at 164. "[A] facially neutral law does not become content based simply because it may disproportionately affect speech on certain topics" or viewpoints. *McCullen v. Coakley*, 573 U.S. 464, 480 (2014). "On the contrary, 'a regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.'" *Id.*, quoting *Ward,* 491 U.S. at 791.

The key question in determining whether a facially neutral regulation is actually content-neutral is "whether the law is 'justified without reference to the content of the regulated speech.'" *Coakley*, 573 U.S. at 480, quoting *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986). To determine whether a law is justified without reference to the content of regulated speech, courts may consider a statute's stated purposes, the purposes of the statute as advanced by the government in litigation, and legislative purposes that can be inferred when a statute "single[s] out for regulation speech about one particular topic." *Coakley*, 573 U.S. at 480–82 (internal quotation marks omitted).

A related but distinct issue concerns statutes that target messages based on the speaker's motives. Such statutes can also be viewpoint-based. A statute's facial discrimination regarding the speaker's motives serves as evidence of an improper justification or purpose. In *R.A.V. v. City of St. Paul*, for example, the Supreme Court considered an ordinance that

made it a crime to place symbols or objects on property that the individual knew would arouse anger or alarm "in others on the basis of race, color, creed, religion or gender." 505 U.S. at 380. The ordinance was viewpoint-based because it allowed people on one side of debates about religion and other topics to display their views freely while restricting the expression of those who disagreed. *Id.* at 391–92. People who used fighting words in favor of racial tolerance and equality would not face liability. People who used those same words to present a message that encouraged racial supremacy or hatred would face liability. This different treatment based on the speaker's motive led the Court to find that the ordinance was viewpoint-based. *Id.*

Even closer to this case, in *Animal Legal Defense Fund v. Kelly*, 9 F.4th 1219 (10th Cir. 2021), a statute banned entering "an animal facility to take pictures by photograph, video camera or by any other means" if done "with the intent to damage the enterprise conducted at the animal facility…." The Tenth Circuit held that the statute discriminated based on viewpoint because it applied to people who engaged in expressive conduct with only that intent. The statute was viewpoint-discriminatory because a "person violates the Act only if her recordings are intended to damage the enterprise, say by exposing animal cruelty or safety violations." *Id.* at 1236. In contrast, an individual whose goal was "to make a laudatory video" would not come within the law's reach. *Id.*

C. *Whether Subsection (2)(a)(7) Is Viewpoint-Based*

Under these standards and precedents, subsection (2)(a)(7) discriminates based on viewpoint on its face. It could survive the First Amendment challenge only if the state can satisfy strict scrutiny.

Here, the distinction between content neutrality and viewpoint neutrality again becomes relevant. The amended hunter harassment law does not target all First Amendment activities that concern hunting as a subject matter. Rather, it prohibits expressive conduct that takes a particular viewpoint towards hunting. It applies only to expressive activities that are "intended to impede or obstruct" hunters or hunting activities. Wis. Stat. § 29.083(2)(a)(7). In other words, those applying the statute must consider speakers' viewpoints in analyzing whether their expressive activity violates the statute. Consequently, subsection (2)(a)(7) is viewpoint discriminatory on its face, and subject to strict scrutiny on that basis.

This conclusion tracks Supreme Court doctrine. In *Rosenberger*, for example, the plaintiffs challenged a university policy that denied payments for printing student publications that primarily promoted a belief "in or about a deity or an ultimate reality." 515 U.S. at 822–23. The Court concluded that the policy was not content-based because it did not deny payments for publications about religion generally. Instead, the Court explained, the policy discriminated on the basis of viewpoint: "viewpoint discrimination is the proper way to interpret" the policy, which by its terms "does not exclude religion as a subject matter but selects for disfavored treatment those student journalistic efforts with religious editorial viewpoints." *Id.* at 831. "The prohibited perspective, not the general subject matter, resulted in the refusal to make third-party payments." *Id.* Here, criminal penalties depend on whether individuals engage in the expressive conduct with "the prohibited perspective," not whether their activities concern "the general subject matter," hunting. The statute is therefore viewpoint discriminatory on its face and consequently subject to strict scrutiny.

Even if subsection (2)(a)(7) were facially neutral, evidence shows that an "impermissible purpose or justification underpins" it. See *Reagan National Advertising*, 596 U.S. at 76. To determine whether a law is justified without reference to the content of regulated speech, we consider the statute's stated purposes and the legislative purposes that can be inferred when a statute "single[s] out for regulation speech about one particular topic." *Coakley*, 573 U.S. at 481 (internal quotation marks omitted). Because subsection (2)(a)(7) cannot be justified without reference to the underlying content of the expression, it is not content-neutral and is subject to strict scrutiny.

Two features of the legislative text show that the statute was motivated by improper purposes and is not content-neutral. First, the statute explicitly discriminates based on the motives of those documenting and monitoring hunting activity. Here, clause (c) of subsection (2)(a)(7) operates much like the statute in *Animal Legal Defense Fund*. When expressive acts are at issue, the clause prohibits only instances where the alleged violator's intent is to impede or obstruct hunting. Applying clause (c) requires enforcement officials to distinguish between expressive conduct based on the speaker's motive and viewpoint toward hunting. These are distinctly non-neutral criteria, a far cry from the "location-based" on- versus off-premises signage line-drawing recently deemed "neutral" in *Reagan National Advertising*. See 596 U.S. at 71–72. Examining whether expressive conduct is undertaken with the intent to "interfere with or obstruct" hunting activity cannot plausibly be described as "agnostic as to content." See *id*. at 76. It more closely resembles an "ordinance against dishonoring the flag," which improperly bans "nonverbal expressive activity" "because of the ideas it expresses." *R.A.V.*, 505 U.S. at 385, citing *Johnson*, 491 U.S. at 406–07. In other words, the Wisconsin

statute tends to "handicap the expression of particular ideas."
*R.A.V.*, 505 U.S. at 394. As the Court said in *R.A.V.*, that "pos-
sibility would alone be enough to render the ordinance pre-
sumptively invalid," since there is good reason to suspect that
"official suppression of ideas is afoot." *Id.* at 390, 394.

The second feature of the statutory text indicating an im-
proper purpose is the substantial overbreadth of subsection
(2)(a)(7) as compared to the pre-amendment statute. The Su-
preme Court has reasoned that the "broad reach of a statute
can help confirm that it was not enacted to burden a narrower
category of disfavored speech." *Coakley*, 573 U.S. at 480–82.
Conversely, a statute with a narrower reach can support an
inference that it was enacted to burden a narrow category of
disfavored speech. As we explained above on substantial
overbreadth, the pre-amendment version of the hunter har-
assment statute already encompassed physical interference
with hunters and hunting activity. Subsection (2)(a)(7)'s only
evident purpose was to expand the statute to reach expressive
activity that does not involve physical interference with hunt-
ing, such as the silent-protest monitoring and documenting
done by plaintiffs and Wolf Patrol. That targeting signals an
improper purpose of discriminating against speech that op-
poses hunting.

Even if the statutory text were not enough to show view-
point discrimination, and here it is, evidence outside the stat-
utory text may help to "elevate [that] possibility to a cer-
tainty." *R.A.V.*, 505 U.S. at 394.[8] The WDNR candidly told its

---

[8] To be sure, the text controls the viewpoint-discrimination analysis,
so we "will not strike down an otherwise constitutional statute" simply
because the legislature's motive was to discriminate. See *United States v.*

officers that the challenged 2016 amendments were "really fueled by the conflict between wolf and bear hunters, and protectionist groups, like Wolf Patrol[,] … who either disagree with hunting or [with] the methods hunters use." Dkt. 47-2 at 14-15. The Senate sponsor of the amendments testified before a Senate committee that he and the co-sponsor had worked together "to craft legislation … to put an end to [the] illegal interference" with hunting by "individuals and groups who are opposed to hunting…." Dkt. 47-4 at 2. In that same vein, the House sponsor testified that the hunter harassment law had to be amended because "there is a group of extremist anti-hunters out there who seem to enjoy making hunters' lives miserable. This group, known as Wolf Patrol …." Dkt. 36-3 at 4. Again, the statutory text alone shows viewpoint discrimination, but these statements make that reading "a certainty." See *R.A.V.*, 505 U.S. at 394.

D. *Applying Strict Scrutiny*

Where a statute discriminates based on viewpoint, courts apply strict scrutiny. See *Reed*, 576 U.S. at 163 (applying strict scrutiny to content-based law). To survive a constitutional challenge, the government must show that the restrictions on speech are "narrowly tailored to serve compelling state interests." *Id.*; see also *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) ("state … must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end").

---

*O'Brien*, 391 U.S. 367, 383 (1968); *DiMa Corp. v. Town of Hallie*, 185 F.3d 823, 829 (7th Cir. 1999). But where the text itself discriminates, legislative history that expresses an intent to discriminate bolsters the presumption of constitutional infirmity. That is the case here.

Defendants offer several arguments to justify the re-strictions on speech included in the statute. They argue that the restrictions serve the state's compelling interests in pro-tecting the constitutional right to hunt, promoting safety in situations where firearms are involved, and educating the public. It prohibits only conduct that is intended to and does interfere with hunting.

We agree that Wisconsin has substantial interests in pro-moting and protecting hunting. Applying strict scrutiny, however, the provisions in the amended hunter harassment law that restrict plaintiffs' speech activities are not necessary to serve those interests. The availability of "adequate content-neutral alternatives" to further the state's interest "'under-cut[s] significantly'" any justification for a statute under strict scrutiny. *R.A.V.*, 505 U.S. at 395–96 (existence of alternative methods meant that only interest served by content-based re-strictions was "displaying the city council's special hostility towards the particular biases thus singled out"), quoting *Boos v. Barry*, 485 U.S. 312, 329 (1988).

The Wisconsin legislature had other means to achieve the goals and interests defendants offer. Defendants have not shown how the original prohibition on physical obstruction of hunting was not sufficient to protect those legitimate inter-ests. Without subsection (2)(a)(7), which targets First Amend-ment activities, both the original and amended statutes pro-hibit interference or attempted interference with hunting "with the intent to prevent the taking of a wild animal," by "impeding or obstructing" either a hunter or an associated hunting activity. Wis. Stat. § 29.223(2)(a)(2)–(3) (1990); § 29.083(2)(a)(2)–(3) (2016). Where any single act of interfer-ence that physically impedes or obstructs hunting is sufficient

under both the original and amended statutes to trigger criminal sanctions, it adds little for the state to also criminalize "[e]ngaging in a series of 2 or more" expressive acts that interfere with hunting. § 29.083(2)(a)(7). Adding prohibitions on First Amendment activities was not necessary.

In fact, subsection (2)(a)(7) could be considered "necessary" only to serving the improper purpose of targeting the silent-protest monitoring and recording activities of plaintiffs and Wolf Patrol that do not physically interfere with hunting. Both hunters and plaintiffs are entitled to be present on public land. Neither group has a right to exclude the other. In Wisconsin, hunters have a constitutional right to hunt, but they do not have a right to avoid contact with people like plaintiffs who disapprove of their hunting. The defense has not offered a plausible scenario in which subsection (2)(a)(7) would have any effect other than to chill First Amendment activities. In other words, defendants all but admit that Wisconsin's legitimate interests in protecting lawful hunting and trapping activities could be achieved just as effectively with the pre-amendment hunter harassment law. The conclusion is that subsection (2)(a)(7)'s only effect is to intimidate plaintiffs and to chill their protected expression opposed to hunting. The amended provision is not narrowly tailored to further the State's interests. Clause (c) of subsection (2)(a)(7) of the amended hunter harassment law cannot survive strict scrutiny.[9]

---

[9] Even if we applied a less demanding standard of scrutiny, we would reach the same conclusion. See, e.g., *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 371, 374, 377 (1997) (striking down "floating 15-foot buffer zones around people and vehicles seeking access" to

Plaintiffs are entitled to summary judgment in their favor. The judgment of the district court is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.

---

reproductive healthcare clinics because they burdened "more speech than necessary to serve a significant governmental interest"); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765, 768–71, 773–74 (1994) (asking "whether the challenged provisions of [an] injunction burden[ed] no more speech than necessary to serve a significant government interest" and up-holding 36-foot "speech-free buffer zone" between antiabortion protestors and health clinic, but invalidating provision that that prohibited "physi-cally approaching any person seeking services of the clinic 'unless such person indicates a desire to communicate' in an area within 300 feet of the clinic" because "the protestors' speech [was not] independently proscrib-able … or so infused with violence as to be indistinguishable from a threat of physical harm").

KIRSCH, *Circuit Judge*, dissenting. To satisfy Article III's case-or-controversy requirement, litigants must show that they have a personal stake (standing) in each of their claims and requests for relief. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203, 2208 (2021). To establish standing, plaintiffs must show an injury-in-fact caused by the defendant that would likely be redressed by the requested relief. *Id.* at 2203 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). When plaintiffs lack standing, we cannot rule on a case. To do so would violate our duty to refrain from issuing advisory opinions.

Here, three individuals have asked a federal court to block enforcement of a state statute that does not reasonably threaten to proscribe their actions. To find standing and reach the plaintiffs' First Amendment challenge, the majority misconstrues the statute by ignoring well-established precedent 67and canons of statutory interpretation. Under the correct interpretation of the statute, the plaintiffs undisputedly lack standing. But even under the majority's interpretation, the plaintiffs cannot show an injury-in-fact, and they fail to explain how their alleged injuries would likely be redressed by the relief they seek.

There is much in the majority opinion with which I disagree. But because the plaintiffs lack standing to bring any of their claims, I do not address the merits. To do so would follow the majority's lead and decide an issue that we cannot reach under our limited Article III authority. I respectfully dissent.

I

In 1990, Wisconsin enacted a hunter-harassment statute that made it illegal for anyone to "interfere or attempt to interfere with lawful hunting, fishing, or trapping with the intent to prevent the taking of a wild animal by doing any of" five listed actions (subsections (1)–(5) below). Wis. Stat. § 29.223(2)(a) (later renumbered as § 29.083). In 2016, Wisconsin amended this statute to clarify that it encompassed intentional interference with activities "associated with lawful hunting, fishing, or trapping" and added three provisions (subsections (6)–(8) below). Only subsection (7) is challenged here. With that provision italicized, the statute now reads:

> No person may interfere or attempt to interfere with lawful hunting, fishing, or trapping with the intent to prevent the taking of a wild animal, *or intentionally interfere with or intentionally attempt to interfere with an activity associated with lawful hunting, fishing, or trapping*, by doing any of the following:
>
> 1. Harassing a wild animal or by engaging in an activity that tends to harass wild animals.
>
> 2. Impeding or obstructing a person who is engaged in lawful hunting, fishing or trapping.
>
> 3. Impeding or obstructing a person who is engaged in an activity associated with lawful hunting, fishing or trapping.

4. Disturbing the personal property of a person engaged in lawful hunting, fishing or trapping.

5. Disturbing a lawfully placed hunting blind or stand.

6. Disturbing lawfully placed bait or other material used to feed or attract a wild animal.

7. *Engaging in a series of 2 or more acts carried out over time, however short or long, that show a continuity of purpose and that are intended to impede or obstruct a person who is engaged in lawful hunting, fishing, or trapping, or an activity associated with lawful hunting, fishing, or trapping, including any of the following:*

> a. *Maintaining a visual or physical proximity to the person.*
>
> b. *Approaching or confronting the person.*
>
> c. *Photographing, videotaping, audiotaping, or through other electronic means, monitoring or recording the activities of the person. This subd. 7. c. applies regardless of where the act occurs.*
>
> d. *Causing a person to engage in any of the acts described in subd. 7. a. to c.*

   8. Using a drone, as defined in s. 941.292(1),
      to conduct any activity prohibited under
      subds. 1. to 7.

Wis. Stat. § 29.083(2)(a).

Stephanie Losse, Joseph Brown, and Louis Weisberg have challenged the italicized provision, seeking only declaratory and injunctive relief. Losse is a volunteer with Wolf Patrol, a group that takes photographs and videos on public lands of hunting activities that may be either illegal or unethical. Brown is a documentary filmmaker who joins Wolf Patrol during monitoring activities. And Weisberg publishes information about hunting and trapping activity in Wisconsin but has never joined Wolf Patrol on a monitoring trip.

At summary judgment, the district court held that the plaintiffs lacked standing to bring an as-applied challenge to the statute because they could not establish a substantial threat of future enforcement. See *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 801–02 (7th Cir. 2016) ("[A]t summary judgment, the plaintiff must set forth by affidavit or other evidence specific facts" to show standing.) (cleaned up). It also held that their facial challenges failed on the merits. The plaintiffs appealed.

II

The first step in deciding whether litigants have standing to challenge a statute is to determine the statute's meaning. *Indiana Right to Life Victory Fund v. Morales*, 66 F.4th 625, 627 (7th Cir. 2023). Problematically, the majority misinterprets the statute by ignoring precedent and fundamental canons of statutory interpretation to find standing and then reach the plaintiffs' First Amendment challenge. Under the correct

reading of the statute (and even under the majority's reading, as I explain later), the plaintiffs lack standing because their conduct falls outside the statute's purview.

As the majority correctly observes, in 1991, the Wisconsin Court of Appeals limited application of subsections (2) and (3) to physical interference or obstruction with a person engaged in hunting activity. *State v. Bagley*, 474 N.W.2d 761, 764 (Wis. Ct. App. 1991) ("[T]he everyday usage of these words contemplates physical interference or obstruction, not verbal."). That interpretation of the statute has never been challenged. Thus, it is well-settled law that to violate subsections (2) or (3), a person must physically impede or obstruct another person engaged in hunting activity.

All agree that if the term impede or obstruct means the same in subsection (7) as it does in subsections (2) and (3), the plaintiffs do not have standing and, even if they did, the amendment is constitutional. *Ante*, at 13 ("[If] the *Bagley* restriction of the statute to 'physical interference' would remain intact [then] plaintiffs should have nothing to worry about from the amendment."); Appellants' Br. at 10–11, 25 (admitting that the plaintiffs do not intend to physically interfere with a person engaged in lawful hunting); see *Bagley*, 474 N.W.2d at 764–65 (upholding the statute against a First Amendment challenge). The question for us is, does it? The majority answers no, concluding that because the activities listed in subsections (7)(a)–(c) can occur without physical interference or obstruction, the *Bagley* restriction cannot be squared with the new provisions. Furthermore, the majority suggests that if the *Bagley* restriction did apply, the 2016 amendment would be merely a futile or symbolic gesture. Both of the majority's assertions are wrong.

As an initial matter, the majority's reasoning fails to acknowledge that it is possible to *physically* impede or obstruct a person while engaging in any of the activities listed in subsections (7)(a)–(c). But more importantly, the majority's reading of the statute ignores the fundamental principle of statutory interpretation that when "judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates … the [legislature's] intent to incorporate its administrative and judicial interpretations as well." *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998); see also *Firstar Bank, N.A. v. Faul*, 253 F.3d 982, 988 (7th Cir. 2001) ("If a phrase or section of a law is clarified through judicial construction, and the law is amended but retains that same phrase or section, then Congress presumably intended for the language in the new law to have the same meaning as the old."); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 322 (2012) ("If a statute uses words or phrases that have already received authoritative construction by the jurisdiction's court of last resort, or even uniform construction by inferior courts or a responsible administrative agency, they are to be understood according to that construction.").

This principle applies with even more force here, where the legislature used the same words (impede or obstruct) in a new subsection of the same statute. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 86 (2006) ("Application of [the prior-construction canon] is particularly apt here; not only did Congress use the same words as are used in § 10(b) and Rule 10b–5, but it used them in a provision that appears in the same statute as § 10(b)."); see also *Law v. Siegel*, 571 U.S. 415, 422 (2014) ("[T]he 'normal rule of statutory construction' [is] that words repeated in different parts of the same statute

generally have the same meaning.") (quoting *Dep't of Revenue of Oregon v. ACF Indus., Inc.*, 510 U.S. 332, 342 (1994)); *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005) ("[I]dentical words used in different parts of the same statute are generally presumed to have the same meaning."); *State v. Williams*, 544 N.W.2d 400, 405 (Wis. 1996) ("[T]he language of one subsection should be construed so as to be consistent with identical language in other subsections of the same statute."). And there is no indication that the legislature intended to reject or ignore the *Bagley* restriction. "[A]bsent 'clear indication' of [the legislature's] plan to change the meaning of a judicially settled construction, that construction should not be disturbed." *United States v. Johnman*, 948 F.3d 612, 619 (3d Cir. 2020) (citing *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 581 U.S. 258, 268 (2017)). This is more than enough to conclude that the *Bagley* restriction applies to subsection (7). But there is more.

In suggesting that subsection (7) would be futile or symbolic if physical interference were required to violate the provision, the majority rejects another fundamental canon: We read statutes in their entirety. See, e.g., *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (noting that it is a "cardinal rule that a statute is to be read as a whole"); *United States v. Pace*, 48 F.4th 741, 753 (7th Cir. 2022) ("We also read a statute 'as a whole' rather than 'as a series of unrelated and isolated provisions.'") (quoting *Arreola-Castillo v. United States*, 889 F.3d 378, 386 (7th Cir. 2018)); *Jarrett v. Lab. & Indus. Rev. Comm'n*, 607 N.W.2d 326, 329 (Wis. Ct. App. 2000) ("Sections of statutes should not be read in a vacuum, but must be read together in order to best determine the statute's plain meaning."). In considering the whole statute, subsection (7) is not symbolic or futile because it is broader than subsections (2) and (3).

The language in subsection (7) is lifted directly from Wisconsin's stalking statute, which, like subsections (2) and (3), has been upheld against First Amendment challenges. *State v. Hemmingway*, 825 N.W.2d 303 (Wis. Ct. App. 2012). The stalking statute provides, in part (with the overlapping language in italics):

> (1)  In this section:
>
> > (a) "Course of conduct" means *a series of 2 or more acts carried out over time, however short or long, that show a continuity of purpose*, including any of the following:
> >
> > > 1. *Maintaining a visual or physical proximity to the* victim.
> > >
> > > 2. *Approaching or confronting the* victim.
> > >
> > > …
> > >
> > > 6m. *Photographing, videotaping, audiotaping, or, through any other electronic means, monitoring or recording the activities of the* victim. *This subdivision applies regardless of where the act occurs.*
>
> …
>
> (2) Whoever meets all of the following criteria is guilty of a Class I felony:
>
> > (a) The actor *intentionally* engages in a course of conduct directed at a specific person that would cause a reasonable person under the same circumstances to suffer

> serious emotional distress or to fear bod-
> ily injury to or the death of himself or her-
> self or a member of his or her family or
> household.

Wis. Stat. § 940.32. There is nothing futile or symbolic about the legislature passing an amended statute that prohibits a person from engaging in a series of acts akin to stalking with the intent to physically interfere with a person engaged in hunting activities.

Subsections (2) and (3) prohibit acts that physically interfere with a person engaged in hunting activities. Subsection (7) goes further by prohibiting a series of acts (akin to stalking), which may not amount to physical interference but are intended to physically interfere with a person engaged in hunting activities, even if they do not have that effect. Like the stalking statute, this distinguishes actions, like photographing, that could be benign on their own, absent the requisite intent. See *State v. Culver*, 918 N.W.2d 103, 112 n.13 (Wis. Ct. App. 2018) ("Absent a speaker's intent to cause serious emotional distress or fear of bodily injury, texts, e-mails, etc., could be construed to be, rather than stalking, benign forms of communication."). While the stalking statute prohibits acts with the intent to cause fear, and the hunter-harassment statute prohibits acts with the intent to cause physical interference, the majority never explains why this distinction would impact the interpretation of the statute.

Indeed, the following example proves how subsection (7) covers more conduct than the prior version of the statute. Assume on day one, Photographer A positions herself directly in the path between a hunter and his prey. This would constitute physical interference with a hunter in violation of

subsection (2). See *Bagley*, 474 N.W.2d at 765 (finding that the defendants physically interfered with a person who wished to fish when they "blocked the boat landing with their boat"). If the hunter manages to successfully complete his hunt despite Photographer A's physical interference, Photographer A would still violate subsection (2) for attempting to interfere with hunting by physically impeding or obstructing the hunter. In other words, whether Photographer A succeeded in actually interfering with the hunt or only attempted to interfere with the hunt but did not actually interfere, either way, Photographer A physically impeded or obstructed the hunter by standing between him and his prey. A necessary element of this subsection (2) violation is that Photographer A physically impeded or obstructed the hunter, regardless of whether she succeeded in interfering with the hunt.

Now, assume that on day two, Photographer B stands in the same location as where Photographer A stood on day one and takes pictures of the hunter, intending to likewise physically interfere with him. But unbeknownst to Photographer B, the prey had changed locations overnight, the hunter was positioned elsewhere, and she does not physically impede or obstruct him. This conduct would not violate subsection (2) because no physical interference of the hunter occurred (even if she attempted to interfere with the hunt). Nor would it violate subsection (7) because Photographer B only engaged in this behavior once, although she did in fact intend to physically interfere with the hunter (and attempt to interfere with the hunt). On day three, Photographer B returns and positions herself, once more photographing the hunter and intending to physically interfere with him, but the prey has moved again, and she does not actually impede or obstruct him. Now, her conduct falls within subsection (7) because she

attempted to interfere with the hunt by engaging in a series of two or more acts that are intended to physically impede or obstruct the hunter, even though she has not violated subsection (2) (or subsection (3)). Or suppose that on day three, Photographer B instead decides to position herself directly in front of the hunter's ladder that leads to his hunting tree stand to take pictures of him. If the hunter arrives but elects to conduct his hunt from the ground rather than the tree stand, Photographer B is in violation of subsection (7) for attempting to interfere with the hunt by intending to physically interfere with the hunter, despite never actually physically impeding or obstructing him.

The majority claims that my example describes "unsuccessful *attempts* to interfere *physically* with hunting" and that "[s]uch attempts were already criminal under the 1990 version of the hunter harassment law." *Ante*, at 15 n.3 (emphasis in original). But the majority improperly reads in the words "attempt[ing] to" prior to "impeding or obstructing a person" in subsection (2). Under the correct reading of the statute, subsection (2) criminalizes attempts to interfere with hunting through an actual (rather than attempted or intended) physical interference with a person engaged in lawful hunting. In other words, the attempted interference is with the hunt itself; there must be actual physical interference with the *hunter*. See Wis. Stat. § 29.083(2)(a)(2) ("No person may … attempt to interfere with lawful *hunting*" by "[i]mpeding or obstructing *a person* who is engaged in lawful hunting.") (emphasis added). Stated differently, it's a violation of subsection (2) to attempt to interfere with a hunt by actually physically impeding or obstructing the hunter. It's a violation of subsection (7) to attempt to interfere with the hunt by intending to physically

impede or obstruct the hunter, even if there is no actual physical interference.

Going back to my example, Photographer A's actual physical interference violates subsection (2), even if the hunt is somehow successful despite the physical interference. Subsection (7) prohibits different behavior. It criminalizes an attempt to interfere with lawful hunting by engaging in a series of acts that are *intended to* impede or obstruct *a person* engaged in lawful hunting, even if physical interference of the hunter never occurs. See Wis. Stat. § 29.083(2)(a)(7) ("No person may … attempt to interfere with lawful *hunting*" by "[e]ngaging in a series of 2 or more acts … that are *intended to* impede or obstruct *a person* who is engaged in lawful hunting.") (emphasis added). In my example, unlike under subsection (2), Photographer B does not need to actually physically impede or obstruct the hunter to violate subsection (7), so long as she intended to physically impede or obstruct him.

Because the majority wants to reach the First Amendment issue, it complains that "the text of subsection (2)(a)(7) makes photography and video recording of hunting its prime targets." *Ante*, at 15 n.3. Again, this ignores the fact that photographing and video recording alone are not covered by the statute. Rather, photographing and video recording are only criminalized under the statute if done in a series of two or more acts with the intent to physically interfere with a person engaged in lawful hunting.

Undoubtedly, there may be overlap between the conduct prohibited by subsections (2), (3), and (7). "But overlap between statutory provisions does not necessarily render a statutory provision superfluous." *Signor v. Safeco Ins. Co. of Illinois*, 72 F.4th 1223, 1231 (11th Cir. 2023); see also *Pasquantino*

*v. United States*, 544 U.S. 349, 359 n.4 (2005) ("The Federal Criminal Code is replete with provisions that criminalize overlapping conduct."); *McEvoy v. IEI Barge Servs., Inc.*, 622 F.3d 671, 677 (7th Cir. 2010) ("The fact that the different sub-paragraphs of [a statute] may overlap to a degree is no reason to reject the natural reading of a statute."). To reach the First Amendment issue, the majority ignores this as well.

The majority says that the Senate and House sponsors' testimony, which the majority labels the "legislat*ure*'s intent," removes any doubt that its interpretation of the statute is correct. *Ante*, at 17 (emphasis added). But as Judge Easterbrook has written: "Legislative intent is a fiction …. Every legislat*or* has an intent …; and the legislat*ure* is a collective body that does not have a mind; it 'intends' only that the text be adopted, and statutory texts usually are compromises that match no one's first preference." Scalia & Garner, *supra*, at xxii (emphasis in original); see *id.* at 376 ("[T]he use of legislative history to find 'purpose' in a statute is a legal fiction that provides great potential for manipulation and distortion."); see also *Bevis v. City of Naperville, Illinois*, No. 23-1353, 2023 WL 7273709, at *16 (7th Cir. Nov. 3, 2023) ("We confess to some skepticism about any test that requires the court to divine legislative purpose from anything but the words that wound up in the statute. Legislator A may have had one goal; Legislator B may have had another; and Legislator C might have agreed to vote for one bill in exchange for a reciprocal vote for Legislator D's pet project later."). Viewing "committee reports and floor speeches [as] worthwhile aids in statutory construction" is a "false notion." *Id.* at 369; see also *Blanchard v. Bergeron*, 489 U.S. 87, 99 (1989) (Scalia, J., concurring) ("It is neither compatible with our judicial responsibility of assuring reasoned, consistent, and effective application of the statutes of the United

States, nor conducive to a genuine effectuation of congressional intent, to give legislative force to each snippet of analysis, and even every case citation, in committee reports that are increasingly unreliable evidence of what the voting Members of Congress actually had in mind.").

In any event, the majority's position that the amendment "*expand[s] prohibited behaviors*" supports my interpretation of the statute. *Ante*, at 17 (emphasis in original). As discussed, the plain reading of the statute reveals that subsection (7) expands the statute to prohibit new conduct, specifically, a series of acts akin to stalking with the intent to physically interfere with a person engaged in hunting activities, even if the conduct does not actually amount to physical interference. And while the majority asserts that the "[d]efendants argue that subsection (2)(a)(7) does not expand the reach of the statute[,]" *ante*, at 13, I do not find that argument anywhere in their brief. Rather, the defendants correctly argue that the statute requires an intent to physically impede or obstruct a hunter in light of *Bagley*. Appellees' Br. at 30 n.5. Even with *Bagley*'s physical interference requirement carrying over, subsection (7) covers new behavior, and it is therefore more than just "an empty political gesture." *Ante*, at 13.

The majority not only misinterprets the statute but skips a step in reaching to determine its constitutionality. The majority acknowledges that our ability under Article III to reach the constitutional issue depends on the state statute's meaning. At a minimum, then, the majority should certify this question of statutory interpretation to the Wisconsin Supreme Court, "which alone can give an authoritative interpretation of state law." *Indiana Right to Life*, 66 F.4th at 632; see *id.* ("[W]hen we are faced with *both* statutory *and* constitutional questions, we

must prioritize resolving the statutory issues if doing so would prevent us from engaging in unnecessary constitutional analysis," particularly when the challenged statute is a state statute.) (citing *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)); *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 306 (1979) ("The paradigm of the 'special circumstances' that make abstention appropriate is a case where the challenged state statute is susceptible of a construction by the state judiciary that would avoid or modify the necessity of reaching a federal constitutional question.") (quoting *Kusper v. Pontikes*, 414 U.S. 51, 54 (1973)). This is true even if the parties have not suggested certification. See *State Farm Mut. Auto. Ins. Co. v. Pate*, 275 F.3d 666, 672 n.5 (7th Cir. 2001) (noting that "this court, sua sponte …, may certify such a question to the state court") (quoting Circuit Rule 52). This way, the majority would avoid "[a] tentative decision[] on questions of state law[] and premature constitutional adjudication," *Babbitt*, 442 U.S. at 306 (quoting *Harman v. Forssenius*, 380 U.S. 528, 534–35 (1965)), that results in the drastic remedy of striking down a state statute on constitutional grounds. See, e.g., *Salazar v. Buono*, 559 U.S. 700, 722 (2010) ("[I]t was incumbent upon the District Court to consider less drastic relief than complete invalidation of the … statute."); *New York v. Ferber*, 458 U.S. 747, 769 (1982) ("Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment, we have recognized that the overbreadth doctrine is 'strong medicine' and have employed it with hesitation, and then 'only as a last resort.'") (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)).

III

Regardless of whether subsection (7) requires physical interference, the plaintiffs lack standing to challenge the statute because they cannot show an injury-in-fact. Nor do they explain how their alleged injuries are likely to be redressed by the relief they seek.

A

Where, as here, no enforcement action has been brought against the plaintiffs, they may nonetheless bring a pre-enforcement suit consistent with Article III's injury-in-fact requirement if the threatened enforcement is "sufficiently imminent." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). In other words, plaintiffs must show that an injury is not merely "'conjectural' or 'hypothetical.'" *Id.* at 158 (quoting *Lujan*, 504 U.S. at 560). The injury must be "certainly impending," or there must be "a 'substantial risk' that the harm will occur." *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)); see also *Babbitt*, 442 U.S. at 298 (finding that an injury is "certainly impending" if "the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder"). Plaintiffs can show a certainly impending, sufficiently imminent injury by showing an "intention to commit similar conduct in [the] future," "a history of enforcement," and a "threat of future enforcement." *Sweeney v. Raoul*, 990 F.3d 555, 559 (7th Cir. 2021) (citing *Holder v. Humanitarian L. Project*, 561 U.S. 1, 15–16 (2010)).

In the First Amendment context, we have fashioned an alternative, but related, "chilling effect" test to show an Article

III injury-in-fact. *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020). This alternative test requires a past or ongoing—rather than future—injury in the form of already "chilled" speech or conduct. *Six Star Holdings*, 821 F.3d at 802 (finding that a statute's alleged "immediate chilling effect" on a party's protected speech is best understood as "an injury that has already occurred"). This test incorporates two elements, one objective and one subjective. First, plaintiffs must show that the statute would deter an objectively reasonable person from engaging in the intended expressive activity, thereby creating a "chilling effect." *Speech First*, 968 F.3d at 638; see also *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) (finding that a subjective fear alone cannot satisfy Article III). To deter an objectively reasonable person, there must be a credible and substantial risk that the government would enforce the statute against the intended expressive activity. *Speech First*, 968 F.3d at 639 n.1. Second, plaintiffs must show that the statute caused them to self-censor because of that chill. *Id.* at 638.

Whether plaintiffs seek to satisfy Article III's injury-in-fact requirement by showing a sufficiently imminent future injury or a past or ongoing chilling effect, they must show a substantial, credible threat that the challenged statute will be enforced against them for the kind of activity in which they intend to engage. *Id.* at 639 n.1 ("Either way, a credible threat of enforcement is critical; without one, a putative plaintiff can establish neither a realistic threat of legal sanction if he engages in the speech in question, nor an objectively good reason for refraining from speaking and self-censoring instead.") (quoting *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018)); see also *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 538 (2021) ("[T]he 'chilling effect' associated with a potentially unconstitutional law being 'on the books' is insufficient to

'justify federal intervention' in a pre-enforcement suit" without "proof of a more concrete injury and compliance with traditional rules of equitable practice.") (quoting *Younger v. Harris*, 401 U.S. 37, 42, 50 (1971)). If a statute "clearly fails to cover" plaintiffs' conduct, then there is not a substantial, credible threat of enforcement under it. *Lawson v. Hill*, 368 F.3d 955, 957 (7th Cir. 2004) (quoting *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003)); see also *Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 687 (7th Cir. 1998) (noting that courts consider whether plaintiffs' "intended conduct runs afoul of a criminal statute" in determining whether there is a credible threat of prosecution). Indeed, even if "it is possible that the plaintiffs 'might be prosecuted under a statute the text of which clearly fail[s] to cover [their] conduct,' such remote fear does not justify an injunction absent something more than a 'nontrivial probability of prosecution.'" *Schirmer v. Nagode*, 621 F.3d 581, 587 (7th Cir. 2010) (quoting *Lawson*, 368 F.3d at 958).

Here, there is no evidence that any plaintiff faces a substantial, credible threat of enforcement for their conduct under subsection (7), which at least requires an intent to impede or obstruct a person engaged in lawful hunting, fishing, or trapping, or an activity associated therewith. The plaintiffs affirmatively disavow such intent.

Wolf Patrol "is a citizen monitoring group … that seeks to take photographs and video on public lands of activities related to hunting that may be illegal" or "unethical." R. 16 at 13. Almost all of Wolf Patrol's monitoring activities are done from vehicles on public roads, and members generally do not exit their vehicles during this monitoring. R. 34 at 2–3 (Losse Decl. ¶ 5); see R. 33 at 2–3 (Brown Decl. ¶ 5). Plaintiff

Stephanie Losse, a Wolf Patrol volunteer, states that she has "never" "interfer[ed]" with hunting or "harass[ed]" hunters, and that "[t]he goal is not to interfere with the hunters or trappers," so she "tr[ies] to stay a minimum distance of 250 feet away" from hunters when monitoring them. R. 34 at 2–3 (Losse Decl. ¶¶ 4–5). Plaintiff Joseph Brown is not a member of Wolf Patrol, see R. 16 at 15 (Brown Dep. 54:7), but he has documented Wolf Patrol's activities to make a documentary on "the pros and cons of hunting wolves in Wisconsin." R. 33 at 2 (Brown Decl. ¶ 3). Because the goal "is to observe, not to interfere," Mr. Brown tries "to maintain a minimum distance of 150 feet when recording hunters." *Id.* at 3 (¶ 5). And Plaintiff Louis Weisberg does not claim to have personally engaged in any monitoring activities; instead, he "primarily rel[ies] on information gathered by reporters who go into the field and document hunting and trapping activity firsthand." See R. 35 at 2 (Weisberg Decl. ¶ 3). There is no evidence that he has even been anywhere near hunting activity. See R. 35 at 2. While he alleges a "fear [of] sending journalists into the field to document" hunter activity, this is based on his misunderstanding of the statute as criminalizing "photographing or recording hunters, or even just remaining in [hunters'] vicinity." R. 35 at 2 (Weisberg Decl. ¶ 3).

There is also no evidence the plaintiffs intend to engage in violative conduct in the future. See *Sweeney*, 990 F.3d at 560 (holding that the plaintiff did not show an imminent injury to establish Article III standing, in part, because the plaintiff did "not suggest an intention to engage in a course of conduct … proscribed by the statute") (citing *Babbitt*, 442 U.S. at 298) (quotation marks omitted); cf. *Holder*, 561 U.S. at 15–16 (holding that the plaintiffs had standing because a statute criminalized knowingly providing material support or resources to a

foreign terrorist organization, and the plaintiffs had provided support to groups designated as terrorist organizations and planned to provide similar support in the future). And unless the plaintiffs express a contrary intent, we should presume that they will continue to follow the law. See, e.g., *O'Shea v. Littleton*, 414 U.S. 488, 497 (1974) (courts generally assume that litigants "will conduct their activities within the law and so avoid prosecution and conviction"); *Swanigan v. City of Chicago*, 881 F.3d 577, 583 (7th Cir. 2018) (the plaintiff's likelihood of being pulled over, arrested, and again subjected to long detention was too low, especially because it was "assume[d]" that the plaintiff would follow the law moving forward); *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017) (threat that the plaintiff would again receive a citation under a city ordinance for using her cellphone while driving was conjectural because it was assumed she would follow the law). Under these circumstances, it would be a "clear misuse" of the law for a prosecutor to charge the plaintiffs with violating the hunter-harassment statute. See *Schirmer*, 621 F.3d at 588 ("Such a clear misuse of a law does not provide a basis for a federal court to explore that law's facial constitutionality.").

The plaintiffs also offer no evidence of the statute's past enforcement against the kind of conduct at issue, casting doubt on the likelihood of future enforcement. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (noting that past enforcement of a criminal statute is "evidence bearing on 'whether there is a real and immediate threat of repeated injury'") (quoting *O'Shea*, 414 U.S. at 496). It is undisputed that the plaintiffs have not been cited, arrested, or prosecuted under any version of Wisconsin's hunter-harassment statute, and no formal enforcement proceedings against them are scheduled. Nor have the plaintiffs offered evidence of any other

individuals being cited, arrested, or prosecuted for the type of expressive activity at issue under either the other, unchallenged provisions of the statute or the challenged subsection, despite the provisions' existence for over thirty years and six years, respectively. Cf. *SBA List*, 573 U.S. at 154, 164–65 (noting that enforcement proceedings were not "rare" because twenty to eighty false statement complaints were filed annually and a mandatory hearing before the full commission had already been scheduled); *Holder*, 561 U.S. at 16 (noting that the government "ha[d] charged about 150 persons with violating [the challenged statute], and that several of those prosecutions involved the enforcement of the statutory terms at issue here"); *Norton v. City of Springfield, Illinois*, 768 F.3d 713, 714 (7th Cir. 2014), on reh'g, 806 F.3d 411 (7th Cir. 2015) (holding that the plaintiffs had standing, in part, because they had received citations for violating the challenged ordinance).

As the majority notes, Brown and Losse were involved in one incident with hunters and police in January 2018, but that event involved an extended confrontation between hunters and Wolf Patrol members. During that incident, the hunters surrounded Wolf Patrol members with their trucks—barricading them—and used a truck to strike a Wolf Patrol member. While the general hunter-harassment statute was cited in the search warrant (without a specific reference to the challenged provision), other possible criminal violations, such as disorderly conduct, disobedience of an officer, and battery, were also cited. Further, there is no evidence that any steps were taken to charge either Brown or Losse based on their involvement in the activity. As a result, it is unreasonable to infer that a substantial risk of enforcement of the challenged provisions exists based on this single incident. And although Brown and Losse have been stopped and questioned by law

enforcement officials at other times during Wolf Patrol activities, none of those stops resulted in citations, fines, arrests, or convictions. Given the type of activity involved (driving around and following a group of people while taking photos and videos of them), it is probable that law enforcement officials would have stopped Losse and Brown even if the challenged provision had not been on the books. Indeed, the plaintiffs' briefs discuss a 2015 traffic stop of Losse based on her Wolf Patrol activities *before* the enactment of subsection (7).

This history of non-enforcement differs from the enforcement proceedings involved in the cases relied on by the majority. In *SBA List*, after a probable-cause determination, a mandatory hearing before the full commission was scheduled, after which the commission could refer the matter for criminal prosecution or issue a public reprimand. 573 U.S. at 153–54. Here, in contrast, no formal enforcement proceedings were scheduled. And in *Hoover v. Wagner*, 47 F.3d 845 (7th Cir. 1995), the plaintiffs or those similarly situated had "been threatened with arrest, arrested, and even prosecuted for violation" of the challenged injunction. *Id.* at 847. As discussed above, there is no evidence that either the plaintiffs here or those similarly situated were ever threatened with arrest, arrested, or prosecuted under the challenged statutory provision. The majority's reliance on *Hoover* is also misplaced because that case, decided nearly thirty years ago, employed a "reasonable probability" standing standard, *id.*, which is "inconsistent with [the Supreme Court's] requirement that 'threatened injury must be certainly impending to constitute injury in fact.'" *Clapper*, 568 U.S. at 410 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (disagreeing with the Second Circuit's "objectively reasonable likelihood" standard).

Finally, if there was any doubt about the enforcement of this statute against the plaintiffs' intended expressive activity, Wisconsin has dispelled it through its guidance to enforcement officials. Cf. *SBA List*, 573 U.S. at 165 (finding it significant that the defendants had "not disavowed enforcement" for similar statements in the future); *Babbit*, 442 U.S. at 302 (same). Wisconsin's Department of Natural Resources issued guidance stating that the amendments to the statute did "not impact the ability to take video/photos to document violations, since there would [be] no intent to interfere and no continuity of purpose to impede or obstruct …." R. 26-1 at 2 (DNR Memo); R. 26-4 at 4 (Law Enforcement News Legislative Update); see *Wisconsin Right to Life, Inc. v. Paradise*, 138 F.3d 1183, 1185 (7th Cir. 1998) (assuming no "well-founded" fear of enforcement when the government presents official, written policy against enforcement) (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988)). And in July 2017, the Wisconsin DNR hosted a meeting with Plaintiffs Brown and Losse, other individuals associated with Wolf Patrol, the United States Forest Service, a county district attorney, and a county sheriff to discuss the amended hunter-harassment statute. R. 29 at 9–10 (Zebro Decl. ¶¶ 47–53). After viewing several Wolf Patrol videos, "[e]veryone in attendance agreed that none of the conduct … constituted interference with hunting, fishing, or trapping, as would violate the elements of Wis. Stat. § 29.083 …." *Id.* After the meeting, the leader of Wolf Patrol stated, "Our concerns were answered. We got confirmation from all three agencies present that what they've seen Wolf Patrol do is not illegal." *Id.* at 10–11 (¶¶ 54–55). DNR has also informed hunters that "simply following the[m] … or videotaping them in public does not constitute hunter harassment under Wis. Stat. § 29.083." R. 23 at 5

(Egstad Decl. ¶ 20). Although Wisconsin's actions do not constitute an express disavowal of any intent to enforce the statute for conduct that properly falls within its scope, they are a disavowal of any attempt to enforce the statute against the plaintiffs' intended conduct, making the likelihood of enforcement against them slight. Cf. *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 592–93 (7th Cir. 2012) (noting that the government "ha[d] not foresworn the possibility of prosecuting the ACLU or its employees and agents" for violating the statute).

Because the plaintiffs' actions fall outside the statute's purview, there is minimal evidence of past enforcement, and Wisconsin has disavowed enforcement actions against the plaintiffs, they have not shown a substantial, credible threat of enforcement. The plaintiffs thus fail to show an Article III injury-in-fact for any of their claims even under the majority's incorrect reading of the statute.

B

Finally, neither the majority nor the plaintiffs adequately explain how the plaintiffs' alleged injuries are "likely to be redressed by" the relief they seek even under the majority's interpretation of the statute. *California v. Texas*, 141 S. Ct. 2104, 2113 (2021) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006)). As the majority notes, "in 2015, a Polk County sheriff's deputy told Losse that she would be cited for violating the hunter harassment law even before the amendments on photography and video recordings took effect." *Ante*, at 4. As for the plaintiffs, they fail to develop any meaningful argument on redressability based on their intended conduct, merely concluding that their injury "will be redressed by a decision in their favor, because a declaratory judgment or permanent injunction forbidding enforcement of the Statute will

lift the chilling effect by completely eliminating the threat of future prosecution." Appellants' Br. at 25. But the plaintiffs' evidence highlighted by the majority shows that the threat of future prosecution can emerge not only from subsection (7) but also from subsections (2) and (3). The alleged chilling effect subsists, in part, in provisions that the plaintiffs do not, and cannot, challenge in light of *Bagley*. The plaintiffs, having indicated a threat of enforcement from the statute as a whole, thus cannot explain, and do not even attempt to explain, how the substantial enforcement risk they fear based on their intended conduct, and the attendant chilling effect, would subside if subsection (7) were stricken but subsections (2) and (3) were to remain. This is something that we cannot overlook. See *Schirmer*, 621 F.3d at 584 ("[W]e must consider [standing] even though the parties have not raised it.") (citing *MainStreet Org. of Realtors v. Calumet City*, 505 F.3d 742, 747 (7th Cir. 2007)).

I would find that the plaintiffs lack standing to seek prospective relief. I respectfully dissent.